No. 16-1850

---

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

DAVID COHAN and SUSAN SCHARDT,

*Plaintiffs-Appellants*,

v.

MEDLINE INDUSTRIES, INC., *et al.*,

*Defendants-Appellees.*

---

**Appeal from the United States District Court**
**For the Northern District of Illinois, Eastern Division**

**Case No. 1:14-cv-01835**
**The Honorable John Robert Blakey**

---

# BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS DAVID COHAN AND SUSAN SCHARDT

---

Alejandro Caffarelli
Lorraine T. Peeters
Caffarelli & Associates Ltd.
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Tel. (312) 763-6880

*Counsel for Plaintiffs-Appellants*

---

**ORAL ARGUMENT REQUESTED**

---

**DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1**

The law firm of Caffarelli & Associates, Ltd. appeared on behalf of David Cohan and Susan Schardt in the United States District Court for the Northern District of Illinois, Eastern Division, and will also appear in the United States Court of Appeal for the Seventh Circuit in this matter.

/s/ Alejandro Caffarelli
Alejandro Caffarelli
Attorney for Plaintiffs-Appellants Cohan and Schardt

Alejandro Caffarelli, #06239078
Lorraine T. Peeters, #06290434
Caffarelli & Associates Ltd.
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Tel. (312) 763-6880

**TABLE OF CONTENTS**

Disclosure Statement Pursuant to Circuit Rule 26.1 .......... ii

Table of Authorities .......... iv

Jurisdictional Statement .......... 1

Issues Presented for Review .......... 3

Statement of the Case .......... 4

I. Factual Background .......... 4

II. Procedural History .......... 10

III. Ruling Presented for Review .......... 12

Summary of Argument .......... 13

Standard of Review .......... 14

Argument .......... 16

I. The District Court Erred in Concluding there were no Agreements that Commissions are "Earned" Upon Receipt of Payment from Clients to Medline .......... 16

II. Cohan and Schardt's Enduring Employment did not Constitute an Implied Acceptance of Medline's Payment Terms, which Ran Afoul of the Written Agreement between the Parties .......... 19

III. The District Court Erred in Concluding that Medline's Compensation Practices Did Not Violate the New York Labor Law .......... 23

IV. The District Court Erred in Concluding that Medline's Compensation Practices Did Not Violate California Wage Law .......... 27

Conclusion .......... 30

Reproduction of Statutes, Rules, and Regulations Pursuant to Fed. R. App. P. 28(f) .......... 31

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) .......... 33

Certificate of Service .......... 34

# TABLE OF AUTHORITIES

## CASES


Advance Cable Co., LLC v. Cincinnati Ins. Co., 788 F.3d 743 (7th Cir. 2015) .......................... 14

Camico Mut. Ins. Co. v. Citizens Bank, 474 F.3d 989 (7th Cir. 2007) ....................................... 18

Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1170 (9th Cir. 2006)........... 20

Cohen v. Lord, Day and Lord, 75 N.Y.2d 95 (Ct. App. 2989) .................................................... 20

Commeford v. Baker, 127 Cal. App. 2d 111 (2d Dist. 1957) ...................................................... 27

Dandy v. United Parcel Service, Inc., 388 F.3d 263 (7th Cir. 2004)............................................ 14

Davis v. G.N. Mortgage Corp., 369 F.3d 869 (7th Cir. 2005)...................................................... 18

Editz v. Nipkow & Kobelt, 264 A.D.2d 437 (Sup. Ct. 1999)....................................................... 25

Gennes v. Yellow Book of New York, Inc., 776 N.Y.S.2d 758 (Sup. Ct. 2004) .................... 20, 24

Gennes v. Yellow Book of New York, Inc., 23 A.D.3d 520 (Sup. Ct. 2005) ............................... 25

Hudgins v. Neiman Marcus Group, Inc., 34 Cal. App. 4th 1109 (1st Dist. 1995) ................. 28, 29

In re Jerich, 238 F.3d 1202 (9th Cir. 2001) .................................................................................. 20

Kerr's Catering Service v. Department of Industrial Relations, 57 Cal. 2d 319 (1962)................ 28

Koehl v. Verio, Inc., 142 Cal. App. 4th 1313 (1st Dist. 2006) ..................................................... 22

Kross v. West Elec. Co., Inc., 701 F.2d 1238 (7th Cir. 1983) ...................................................... 14

Loudermilk v. Best Pallet Co. *et al.*, 636 F.3d 312 (7th Cir. 2011)....................................... 14, 15

Maldonado v. La Nueva Rampa, Inc., No. 10 Civ. 8195, 2012 WL 1669341(S.D.N.Y. May 14, 2012) ........................................................................................................................................... 25

Pachter v. Bernard Hodes Grp., Inc., 10 N.Y.3d 609 (N.Y. 2008)................................... 22, 23, 26

Quillian v. Lion Oil, 96 Cal. App. 3d 156 (1st Dist. 1979) ......................................................... 28

Schaefer v. First Nat'l B. of Lincolnwood, 509 F.2d 1287 (7th Cir. 1975).................................. 14

Sciborski v. Pac. Bell Directory v. Pac. Bell Directory, 205 Cal. Ct. App. 4th 1152 (2012).. 22, 28

Steinhebel v. Los Angeles Times Communications, 126 Cal. App. 4th 696 (2d Dist. 2005) .......27

Vodak v. City of Chicago, 639 F.3d 738 (7th Cir. 2011) .......14

Waldridge v. Am. Hoechst Corp., 24 F.3d 918 (7th Cir. 1994) .......14

Weiner v. Diebold Gr., Inc., 173 A.D.2d 166 (Sup. Ct. 1991) .......20

**STATUTES**

Cal. Lab. Code, § 219(a) .......20, 23

Cal Lab. Code § 200 .......27

Cal. Lab. Code § 221 .......27

Cal. Lab. Code § 223 .......29

Cal. Lab. Code § 224 .......27

NYLL § 191(1)(c) .......23

NYLL § 193(1) .......23, 24, 25

**OTHER AUTHORITIES**

DLSE Opinion Letter 2002.12.09-2 .......27

## JURISDICTIONAL STATEMENT

The District Court of the Northern District of Illinois had subject matter jurisdiction over this action alleging violations of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. § 115.1 *et seq.* ("IWPCA"); and violations of the wage laws of the residence states of Plaintiffs and each member of the Putative Class, pursuant to 28 U.S.C. § 1332(d) (diversity jurisdiction per the Class Action Fairness Act of 2005 ("CAFA")) as well as individual diversity pursuant to 28 U.S.C. § 1332(a).

The basis for diversity of citizenship is as follows:

1. David Cohan, Plaintiff - Appellant, is a natural person and a citizen of the State of New York. Mr. Cohan's individual claims against Medline Industries, Inc. and Medcal Sales, LLC exceed two hundred fifty thousand dollars ($250,000.00).

2. Susan Schardt, Plaintiff - Appellant, is a natural person and a citizen of the State of California. Ms. Schardt's individual claims against Medline Industries, Inc. and Medcal Sales, LLC exceed two hundred fifty thousand dollars ($250,000.00).

3. The putative class is a national class where upon information and belief less than ten percent of the class members are citizens of the State of Illinois.

4. The putative class claims against Medline Industries, Inc. and Medcal Sales, LLC exceed five million dollars ($5,000,000.00).

5. Medline Industries, Inc. ("Medline"), Defendant – Appellee, is an Illinois corporation with its corporate headquarters located at One Medline Place, Mundelein, Illinois 60060.

6. MedCal Sales, LLC ("MedCal"), Defendant – Appellee, is a domestic limited liability company under the State of Illinois' jurisdiction. The sole member of MedCal is Medline, an Illinois corporation with its corporate headquarters located at One Medline Place, Mundelein, Illinois 60060.

Further, Medline[1] employed Cohan and Schardt (and the putative class members) pursuant to Employment Agreements containing an Illinois choice of law and choice of forum provision.

The Seventh Circuit Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. The District Court entered a final order on March 21, 2016, granting Medline and MedCal summary judgment on all counts of the complaint, thereby disposing of all claims. David Cohan and Susan Schardt filed their Notice of Appeal on April 18, 2016.

[1] Here and throughout this brief, the Defendants-Appellees are collectively referred to as "Medline."

**ISSUES PRESENTED FOR REVIEW**

Whether the District Court erred when it granted summary judgment against Cohan and Schardt by finding that there was no evidence that Cohan and Schardt "earned" their commissions prior to Medline deducting "negative commission" payments; and whether the District Court erred when it found that Medline's manner of calculating commission payments to Cohan and Schardt unequivocally did not violate the New York Labor Law and the California Wage Laws, respectively.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

Medline is a manufacturer and distributor of healthcare supplies in the United States, with its corporate headquarters in Mundelein, Illinois. (D.E. 84 at p. 14, Ans. to Third Am. Compl. at ¶¶ 9, 10.) Medline employs outside salespeople from around the nation as Sales Representatives in their Advanced Wound Care ("AWC") division. (Id.) Cohan and Schardt were each employed as Sales Representatives in the Defendants' AWC division. (Id. at ¶¶ 5,6.) Cohan, a New York resident, sold Medline's products in a territory primarily consisting of New York accounts. (D.E. 94-1 at pp. 43, 83-84, Cohan Dep. Tr. at 23:5-9, 63:18-64:22.) Schardt, a California resident, sold Defendants' products in a territory that largely consisted of California accounts. (D.E. 94-1 at pp. 321-322, 432-434, Schardt Dep. Tr. at 15:24-16:13, 126:4-128:6.)

As a condition of employment with Medline, both Cohan and Schardt were required to enter into written Employment Agreements. (D.E. 84 at pp. 8-9, Ans. to Third Am. Compl. at ¶¶ 27-28, 31.) Cohan originally entered into an Employment Agreement dated March 25, 1999, which set forth the terms and conditions of his employment. (D.E. 94-2 at pp. 110-118, 1999 Cohan Agreement.) Cohan also entered into an Agreement Regarding Continued Employment (the "Continued Employment Agreement") dated November 26, 2007, by and large stating that Cohan would continue to be subject to his 1999 Employment Agreement. (D.E. 94-2 at pp. 120-122, 2007 Continued Employment Agreement at ¶ 1.) Schardt worked pursuant to two Employment Agreements: one dated February 19, 2001 between her and Medline, and another dated February 10, 2006 between her and MedCal. (D.E. 94-2 at pp. 124-132, 2001 Schardt Agreement; D.E. 94-2 at pp. 134-141, 2006 Schardt Agreement.) Cohan's 1999 Employment Agreement and Schardt's two Agreements are substantively identical.

The Employment Agreements contained the following verbiage, regarding Salesperson commission compensation:

- "Medline[/MedCal;] shall pay to Salesperson commissions with respect to the collections of all sales made by Medline to customers in the territory described in [the Agreement] . . . provided the **collection date of any such sale** is on or after the date Salesperson commences performance of his duties as a salesperson hereunder and is on or before the effective date of termination of the Agreement under any circumstances. Salesperson shall be entitled to a commission on any sale as set forth herein, irrespective of whether Salesperson shall have been responsible for such sale . . .." (D.E. 94-2 at p. 112, 1999 Cohan Agreement at ¶ 6(a); D.E. 94-2 at p. 136, 2006 Schardt Agreement at ¶ 6(a) (emphasis added).)

- "[C]ommissions on sales **for which the collections are received** by Medline prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month." (D.E. 94-2 at p. 113, 1999 Cohan Agreement at ¶ 6(f); D.E. 94-2 at p. 127, 2001 Schardt Agreement at ¶ 6(e); D.E. 94-2 at p. 137, 2006 Schardt Agreement at ¶ 6(f) (emphasis added).)

- "[C]ommissions shall be deemed **earned by Salesperson only if collected** prior to the effective date of termination of this Agreement under any circumstances. All commissions **so earned** during the term of such notice period shall be paid to Salesperson **provided Medline receives actual payment** from the customer prior to the termination date." (D.E. 94-2 at p. 113, 1999 Cohan Agreement at ¶ 6(k); D.E. 94-2 at p. 127, 2001 Schardt Agreement at ¶ 6(i); D.E. 94-2 at p. 137, 2006 Schardt Agreement at ¶ 6(k) (emphasis added).)

Cohan's Continued Employment Agreement further specified that Cohan would be compensated in part through a "[c]ommission plan based on sales growth year over year for assigned territory." (D.E. 94-2 at p. 120, 2007 Continued Employment Agreement at ¶ 1.)

As AWC Sales Representatives, and pursuant to provisions in their Employment Agreements, Cohan and Schardt's compensation was further detailed and revised on an annual basis, as described in Compensation Plans ("Pay Plans") that were issued each year. (D.E. 95, Group Ex. L to Pls. Mot. Summ. J., filed under seal.) Both Cohan and Schardt were paid in part on a commissions based on sales growth in their assigned territories as compared to the previous

year. (D.E. 94-2 at pp 9-11, Medline's Answer to Interrogatories at ¶ 5.) Indeed, their Pay Plans referred to commissions being paid on "sales growth," and in many instances included examples showing positive monthly growth year-over-year resulting in a positive number in commission compensation. For instance, the Pay Plans from 2004-2007 specify that "[c]ommissions are based on monthly sales growth and profitability," and each gives an example showing positive monthly growth year-over-year, then multiplying that monthly growth number by the base profit percentage and then by 20% to arrive at a positive number for commission compensation. (D.E. 95 at MEDLINE 005614, 005618, 005623, 005631, 2004-2007 Pay Plans.) Likewise, the Pay Plans for 2010-2014 describe only that commissions are paid on "sales growth." (D.E. 95 at MEDLINE 000374, 000376, 000381, 000383, 001020, 2012-2014 Pay Plans.)

Based on their written Employment Agreements and Pay Plans, Cohan and Schardt had no indication that a decline in sales within a territory would lead to a deduction from their commission payments. (D.E. 94-1 at pp. 94, 124-127, 137, 143-144, 152, 154-155, 157, Cohan's Dep. Tr. at 74:1-4, 104:21-105:2, 105:8-15, 106:10-21, 117:23-118:1, 122:7-16, 122:21-123:1, 132:8-16, 134:13-24, 135:1-5, 137:6-12; D.E. 94-1 at pp. 392, 395-397, 401, 415-416, 423, Schardt Dep. Tr. at 86:20-22, 89:20-90:2, 90:8-91:4, 91:9-19, 95:6-13, 109:4-110:8, 110:16-111:24, 117:14-18.) Indeed, neither the Employment Agreements (in several paragraphs describing compensation) nor the voluminous Pay Plans stated that any amounts would be *deducted* from compensation based on a decline in sales on existing accounts, or that a loss in sales would lead to "negative growth" factoring into commission payments. Certainly, nothing in the controlling instruments states that a Sales Representative's commission income could drop *below* zero, such that he or she would then *owe* payment to Medline.

Rather, based on the straightforward language in their Employment Agreements and Pay

Plans, Cohan and Schardt understood that they had agreed with Medline that they would be paid commissions based on year-over-year sales growth, and that those commissions were fully "earned" as soon as Medline received payment. (D.E. 94-1 at pp. 94, 124-127, 137, 143-144, 152, 154-155, 157, Cohan's Dep. Tr. at 74:1-4, 104:21-105:2, 105:8-15, 106:10-21, 117:23-118:1, 122:7-16, 122:21-123:1, 132:8-16, 134:13-24, 135:1-5, 137:6-12; D.E. 94-1 at pp. 392, 395-397, 401, 415-416, 423, Schardt Dep. Tr. at 86:20-22, 89:20-90:2, 90:8-91:4, 91:9-19, 95:6-13, 109:4-110:8, 110:16-111:24, 117:14-18.) As a natural corollary to this concept, Cohan and Schardt understood that they would not earn commissions if they failed to grow sales year-over-year; in other words, that Medline would "zero out" the commissions on any category of sales where there was a year-over-year drop in sales. (D.E 94-1 at p. 162, Cohan Dep. Tr. at 142:19-23; D.E. 94-1 at pp. 351-353, 358, 401, 409, Schardt Dep. Tr. at 45:24-46:3, 52:3-8, 95:6-13, 95:20-96:5, 103:17-22.)

The following chart illustrates Cohan and Schardt's fundamental understanding of the compensation agreement in place, based on the language of their Employment Agreements and Pay Plans:

| **(Cohan and Schardt's View)** | January 2010 sales | January 2011 sales | Year-over-year change in sales | Commissions earned (at rate of 5%) |
|---|---|---|---|---|
| Account 1 | $500K | $1,500K | $1,000K | $50K |
| Account 2 | $500K | $100K | -$400K | $0 |
| Account 3 | $500K | $0 | -$500K | $0 |

As set forth, for the three accounts in this example, total commissions earned for payments on sales in the month of January 2011 should total $50K.

Medline, however, did not calculate Cohan's and Schardt's commissions in a manner consistent with the Employment Agreements and Pay Plans. Instead, to calculate a Sales Representative's sales growth for any given month, Medline began with that Representative's

current month's invoiced sales, and subtracted the invoiced sales from the same month in the previous year for each category of product sold in the Representative's territory. (D.E. 94-2 at p. 10, Medline Answer to Interrogatory ¶ 5.) If the Sales Representative's invoiced sales were higher than the invoiced sales in the same month of the previous year, then the difference would yield a positive sales growth number. (Id.) If the Sales Representative's invoiced sales were lower than the invoiced sales in the same month of the previous year, then the difference would yield a "negative sales growth" number. (Id.) (This "negative sales growth" number is the root of the parties' contention.) Once these calculations were completed for the individual categories of product sold by the Sales Representative, Medline added up all categories (both positive and negative growth numbers) to determine the total net growth for the Sales Representative's entire book of business. (Id.)

To determine monthly commission payments for each individual Sales Representative, Medline multiplied the month's net sales growth number for his or her entire book of business – whether positive or negative – by an assigned commission percentage. (Id.) If a Sales Representative had negative net growth, Medline's method for determining earned commission would result in a negative sales growth commission, which Medline referred to as a "negative commission." (Id.) The negative commissions were then subtracted from positive commissions and/or the Sales Representative's draw, and carried over to the Sales Representative's next pay sheet if the balance remained below zero after those subtractions had been made. (D.E. 94-2 at pp. 99-100, Dorshorst Dep. Tr. at 81:18-82:14.)

Using the same sales numbers as the illustration above, Medline's compensation practices would result in the following commission payments:

| (Medline's View) | January 2010 sales | January 2011 sales | Year-over-year change in sales | Commissions earned (at rate of 5%) |
|---|---|---|---|---|
| Account 1 | $500K | $1,500K | $1,000K | $50K |
| Account 2 | $500K | $100K | -$400K | -$20K |
| Account 3 | $500K | $0 | -$500K | -$25K |

Thus, for those three accounts, Medline's commission calculation practices would result in a total payment of just $5K on sales in the month of January 2011 (though less if the Sales Representative carried any kind of negative commission balance from the previous month).

Certainly, neither Cohan nor Schardt ever provided Medline with express written consent to deduct money from commission payments based on the failure to grow sales year over year. (D.E. 94-1 at pp. 128, 135-136, 182-183, 220, Cohan Dep. Tr. at 108:14-21, 115:16-116:8, 116:18-23, 162:15-163:7, 200:7-23; D.E. 94-1 at pp. 337, 350-352, Schardt Dep. Tr. at 31:6-10, 44:17-22, 45:13-16, 46:9-14.) Defendants even deducted payments from Sales Representatives based on a decline in year-over-year growth, even when the reason for the decline may have been outside of the control of the Representative – for instance, if accounts were shut down or not purchasing as much volume due to natural disasters (such as Hurricane Sandy), or if an account was already declining before it was assigned to a Sales Representative's territory. (D.E. 94-1 at pp. 206, 223-227, Cohan Dep. Tr. at 186:20-24, 203:19-207:24.) It is undisputed and the District Court found that over the years, both Cohan and Schardt consistently questioned and vocally disagreed with the "negative commission" deductions. (D.E. 107 at pp. 11-14.)

In 2015, incidentally, Medline clarified its compensation practices to align with Cohan and Schardt's understanding of the plan, and amended its written compensation plans to specifically "zero out" any negative growth commissions: "If the year over year comparison yields a total negative value within a particular category, you will receive no additional component for sales growth in that category." (D.E. 95 at Schardt 000081.)

## II. PROCEDURAL HISTORY

Cohan filed his Illinois class action lawsuit, alleging that Medline unlawfully deducted wages without contemporaneous written authorization in violation of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. § 115/1 *et seq.* (IWPCA), in the Northern District of Illinois on March 14, 2014. (D.E. 1, Complaint.) On May 5, 2014, Cohan amended his Complaint to expand the putative class to include nationwide employees, and add an alternative count alleging that Medline deducted compensation in violation of the wage laws of the residence states of Cohan and all putative class members nationwide. (D.E. 14, First Amended Complaint.) On September 25, 2014, Cohan filed a Second Amended Complaint, adding Schardt and Mark Campbell as named plaintiffs, and MedCal as a defendant. (D.E. 44, Second Amended Complaint.) The District Court granted Campbell's motion to voluntarily withdraw on January 1, 2015, leaving just Cohan and Schardt as the two named plaintiffs, and both Medline and MedCal (collectively, "Medline") as the named defendants. (D.E. 62, Order granting motion to withdraw Campbell.) Cohan and Schardt filed a Third Amended Complaint on April 29, 2015, removing all reference to Campbell and amending Count II from an alternative pleading to a pleading in conjunction with Count I. (D.E. 83, Third Amended Complaint.)

On June 15, 2015, the parties filed cross-motions for summary judgment, based on the allegations as set forth in the Third Amended Complaint. (D.E. 88, Medline's Mot. for Summ. J.; D.E. 92, Cohan and Schardt's Mot. for Summ. J.) Medline argued that (1) Cohan and Schardt could not claim any right to relief under the IWPCA, because the IWPCA does not apply extraterritorially for out-of-state workers; (2) Even if they could assert protections under the IWPCA, Medline made no unlawful deductions because there was no agreement that Medline

would calculate commissions in the manner proposed by Cohan and Schardt; (3) Medline did not violate § 193 of the New York Labor Law, based on Cohan's implied agreement with the manner in which Medline calculated commissions; (4) Schardt's claim under the California Labor Code fails because there is no right of private action under § 221 of the Labor Code; and (5) alternatively, Medline made no unlawful deductions in violation of § 221 of the California Labor Code, based on Schardt's implied agreement with the manner in which Medline calculated commissions. (D.E. 88, Medline's Mot. for Summ. J. at ¶ 3.) Cohan and Schardt argued that (1) the parties agreed that Cohan and Schardt would be paid commissions on "growth" in sales; (2) their commissions were "earned" prior to Medline deducting commission payments based on losses in sales; (3) Medline's commission deduction practice, with respect to Cohan, violated § 193 of the New York Labor Law as it constitutes an unauthorized deduction from earned wages; (4) this practice, with respect to Schardt, violated the California Labor Code as it constitutes an unauthorized deduction from earned wages; (5) Cohan and Schardt qualified for protection as "employees" under the IWPCA; and (6) Medline's commission deduction practice violated the IWPCA as it constitutes an unauthorized deduction from earned wages. (D.E. 93, Pl. Mem. in Supp. Mot. for Summ. J.)

The parties filed their cross-responses on July 6, 2015. (D.E. 96, Medline Resp.; D.E. 99, Cohan and Schardt's Resp.) The parties filed their cross-replies on July 20, 2015. (D.E. 101, Medline Reply; D.E. 102, Cohan and Schardt's Reply.) On March 21, 2016, the District Court issued an order granting Medline's motion in full, and denying Cohan and Schardt's motion in full. (D.E. 107, Memorandum Opinion and Order.)

## III. RULING PRESENTED FOR REVIEW

Cohan and Schardt appeal from the district court's order granting summary judgment to Medline and dismissing their claims under New York and California law (D.E. 107). Cohan and Schardt do not appeal the lower court's dismissal of their claim under Illinois law.

In granting Medline's motion, as is relevant to this appeal, the lower court found that there was "no indication" that commissions were "earned" by Cohan and Schardt "before the calculation of commissions (by subtracting negative growth) was complete." (D.E. 107 at p. 22, Opinion at p. 22.) The lower court further disagreed that there was any type of agreement by Medline to pay commissions in the manner sought by Cohan and Schardt (Id.), and found that Cohan and Schardt had "provided no evidence that they were entitled to a commission calculation that ignored negative sales growth" (Id. at p. 24). Upon concluding that commissions were not "earned" until legitimate negative sales numbers were incorporated into the commission calculations, the lower court thus concluded that Medline's practices violated neither New York nor California law. (Id. at pp. 24-26.) In drawing this conclusion, the lower court did not analyze whether Medline's compensation practices violated New York or California law, regardless of when commissions were "earned."

## SUMMARY OF ARGUMENT

Medline failed to compensate Cohan and Schardt in the manner described in their Employment Agreements and annual Pay Plans. Cohan and Schardt should have been paid commissions on sales *growth*, due and owing as soon as their clients paid Medline; if their year-over-year sales did not *grow*, then by the terms of the controlling written instruments they understood and agreed that they would earn zero commissions on those particular accounts. Instead, Medline protected itself against losses stemming from a reduction in business, by assessing "negative commission" payments from Cohan and Schardt if and when they had any decline in sales year-over-year. This practice both reduced the amount in "earned" commissions payable to Cohan and Schardt, and also caused them to actually "owe" commission payments back to Medline, which carried from payment to payment until Cohan and Schardt no longer had a negative balance on money owed to Medline. Thus, this practice of recouping "negative commission" payments resulted in the deduction of earned commission wages.

Said wage deductions were not authorized in writing by Cohan or Schardt, nor could Cohan and Schardt legitimately have waived their right to full compensation. Because the evidence, viewed in the light most favorable to the Appellants, shows that Medline deducted amounts from Cohan and Schardt's earned commission income without written authorization to do so, the lower court erred in granting summary judgment to Medline. Based upon the pertinent written instruments and applicable case law, a reasonable finder of fact could conclude that Medline acted in violation of the wage payment laws of New York and California. At the very least, any disagreement between the parties regarding the scope of their written agreements and policies should have precluded the lower court from granting summary judgment to either party.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. Dandy v. United Parcel Service, Inc., 388 F.3d 263, 268 (7th Cir. 2004). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). When considering allegations and arguments on summary judgment, the court is generally guided by the principle that the non-moving party must be given "the benefit of all facts that a reasonable jury might find." Loudermilk v. Best Pallet Co. *et al.*, 636 F.3d 312, 314 (7th Cir. 2011); Kross v. West Elec. Co., Inc., 701 F.2d 1238, 1242 (7th Cir. 1983) (quoting Schaefer v. First Nat'l B. of Lincolnwood, 509 F.2d 1287, 1297 (7th Cir. 1975)). Where, as here, the parties have filed cross-motions for summary judgment, on appeal the Court must construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration was made. Advance Cable Co., LLC v. Cincinnati Ins. Co., 788 F.3d 743, 746 (7th Cir. 2015).

Unfortunately, the Seventh Circuit is often burdened with having to evaluate facts on appeal because the district court has failed to adhere to this axiom of the summary judgment standard. Judge Posner recently expressed his frustration with defendants "present[ing] the evidence they'd like a jury to accept, rather than just the evidence that, being unrefuted or irrefutable, provides a permissible basis for a grant of summary judgment. Such a mode of presentation is unhelpful to the court." Vodak v. City of Chicago, 639 F.3d 738, 740 (7th Cir. 2011) (reversing summary judgment upon an analysis of the facts stated "as favorably to the plaintiffs as the record permits"). Somewhat recently, Judge Easterbrook reversed and remanded the district court's grant of summary judgment in Loudermilk, 636 F.3d at 314, after concluding that the district court judge had improperly taken the employer's view of the evidence. In

reaching its conclusion in that case, the Seventh Circuit took the entirety of the opinion's factual narrative "from [the non-moving party's] allegations and evidence," which the court reiterated it "must accept" for summary judgment purposes. Loudermilk, 636 F.3d at 314.

In this case, the District Court failed to recognize or analyze several key facts favoring Cohan and Schardt, choosing instead to favor Medline's narrative of what the persuasive evidence should be. In addition, the District Court drew inferences against them in granting Medline's motion, in direct contravention to the summary judgment standard. Summary judgment should not have been granted to Medline here. When the facts are viewed in the light most favorable to Cohan and Schardt, and all reasonable inferences drawn in their favor, a jury could reasonably find for them on their respective state law wage claims. For these reasons and those articulated below, the District Court's summary judgment against Cohan and Schardt should be reversed and remanded for further class discovery and a jury trial on Count II of their Third Amended Complaint.

## ARGUMENT

### I. The District Court Erred in Concluding there were no Agreements that Commissions are "Earned" Upon Receipt of Payment from Clients to Medline

This case turned upon the lower court's determination about when Cohan's and Schardt's commissions were "earned." The District Court's order clarifies that if commissions were "earned" prior to Medline deducting "negative commissions," Cohan and Schardt might state viable claims under their respective state wage laws. However Medline argued, and the lower court agreed, that commissions were not earned until Medline had already factored in its employees' "negative sales growth" numbers to calculate net sales growth per month. Cohan and Schardt, however, presented evidence that their commissions were in fact already earned prior to the deductions for "negative growth," specifically once Medline received payments from its customers. Further, Cohan and Schardt argued that the controlling written instruments did not provide for "negative commission" deductions whatsoever, and certainly not to the extent that Sales Representatives would end up carrying a negative sales commission balance from check to check. The lower court erred in failing to account for Cohan's and Schardt's argument.

Cohan and Schardt derive their understanding of when their commissions were "earned" from the plain, unambiguous language of their Employment Agreements. Specifically, their Agreements state as follows:

- Medline[/MedCal;] shall pay to Salesperson commissions **with respect to the collections of all sales** made by Medline to customers in the territory described in [the Agreement] . . . provided the **collection date of any such sale** is on or after the date Salesperson commences performance of his duties as a salesperson hereunder and is on or before the effective date of termination of the Agreement under any circumstances. Salesperson shall be entitled to a commission on any sale as set forth herein, irrespective of whether Salesperson shall have been responsible for such sale . . .." (D.E. 94-2 at p. 112, 1999 Cohan Agreement at ¶ 6(a); D.E. 94-2 at p. 136, 2006 Schardt Agreement at ¶ 6(a) (emphasis added).)

- "[C]ommissions on sales **for which the collections are received** by Medline prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month." (D.E. 94-2 at p. 113, 1999 Cohan Agreement at ¶ 6(f); D.E. 94-2 at p. 127, 2001 Schardt Agreement at ¶ 6(e); D.E. 94-2 at p. 137, 2006 Schardt Agreement at ¶ 6(f) (emphasis added).)

- "[C]ommissions shall be deemed **earned by Salesperson only if collected** prior to the effective date of termination of this Agreement under any circumstances. All commissions **so earned** during the term of such notice period shall be paid to Salesperson **provided Medline receives actual payment** from the customer prior to the termination date." (D.E. 94-2 at p. 113, 1999 Cohan Agreement at ¶ 6(k); D.E. 94-2 at p. 127, 2001 Schardt Agreement at ¶ 6(i); D.E. 94-2 at p. 137, 2006 Schardt Agreement at ¶ 6(k) (emphasis added).)

Based on these provisions, it is quite clear that commissions are fully earned once Medline collects payment on a representative's sales. The final condition precedent is unambiguous; nothing else in the Agreements challenges or muddies this interpretation. Notably, the Employment Agreements do not even hint that commissions are deemed earned after the customer pays *and* Medline adds together the commissions on all positive growth and subtracts commission payments on accounts that failed to exhibit growth. There is absolutely no reference to determining "total" or "net" growth before commissions are earned.

The AWC Pay Plans (D.E. 95) further clarified the commission payment structure, and were incorporated into the Employment Agreements. These Pay Plans made it clear and unambiguous that commissions would be based on "sales growth," analyzing sales during a given month year-over-year. (D.E. 95 at MEDLINE 005614, 005618, 005623, 005631, 2004-2007 Compensation Plans; D.E. 95 at MEDLINE 000374, 000376, 000381, 000383, 001020, 2010-2014 Commission Plans.) The Pay Plans through 2007 even specifically illustrated the calculation of commissions based on sales growth. (Id.) There is no provision for the calculation of deductions from commissions based on a decline in sales. In fact, there is not one Pay Plan that refers to a decline in sales year-over-year, or explains that a failure to produce

profit or growth would lead not to a mere zero value commission, but an actual deduction of commissions previously paid on territory sales. The AWC Pay Plans are clear, throughout, that commissions "are based on monthly sales growth and profitability." (Id.) Notably, Cohan's Continued Employment Agreement also specified that the commission plan would be based on "sales growth" year over year for his assigned territory. (D.E. 94-2 at p. 120, 2007 Continued Agreement at ¶ 1.)

Illinois courts adhere to the "four corners rule" of contract interpretation, which provides that "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." Camico Mut. Ins. Co. v. Citizens Bank, 474 F.3d 989, 992-993 (7th Cir. 2007) (quoting Davis v. G.N. Mortgage Corp., 369 F.3d 869, 878 (7th Cir. 2005)). In other words, Illinois courts interpret unambiguous contract terms according to their plain meaning. Camico, 474 F.3d at 993. Here, for instance, "growth" must be interpreted as "progressive growth," and not contorted to mean either progressive growth *or* a decline; one does not typically refer to a reduction in value as "negative growth," as the phrase is oxymoronic and counterintuitive. The Employment Agreements and Pay Plans were unambiguous: commissions were *earned* once Medline was paid, and *calculated for payment* to Sales Representatives based on monthly profitability and growth year over year for the accounts in a territory. These are two separate steps in the Agreements and Pay Plans, together constituting the complete written agreement between the parties. A failure to grow would mean no earned commission, not that the written instruments provided for a deduction from pay.

Despite being presented with the clear language of the Agreements and Pay Plans, the lower court in this case held that "[o]f all the agreement language cited by [Cohan and Schardt], there is no indication that the calculation of commissions based on growth would exclude the effect that a decline in sales had upon that growth. Nor is there any indication that the commissions were "earned" before the calculation of commissions (by subtracting negative growth) was complete." (D.E. 107 at p. 22.) This view simply ignores the plain language of the written instruments in question, with no explanation, and certainly does not construe the language of the agreements in the light most favorable to Cohan and Schardt. It also ignores that Cohan and Schardt agreed and accepted that per the Agreements and Pay Plans, they would earn no (not "negative") commissions on certain sales if they had a decline in sales year over year.

The lower court appears to have based its conclusion wholly upon extrinsic evidence championed by Medline, that Cohan's and Schardt's decision to continue working for Medline despite being aware of the wage deductions, was some kind of tacit agreement to waive their right to enforce the written compensation agreements and pay plans in place. As set forth above, this extrinsic evidence should not have been considered. As set forth below, the lower court's ultimate interpretation is flawed, and should be reversed.

## II. Cohan and Schardt's Enduring Employment did not Constitute an Implied Acceptance of Medline's Payment Terms, which Ran Afoul of the Written Agreements between the Parties.

The lower court erred in concluding that Cohan and Schardt accepted that they had not "earned" their commissions until after Medline had already factored a deduction for any decline in sales into the commission calculations. Per the unambiguous language of their Agreements, these commissions were already "earned" by the time Medline came to compare sales month to month, year over year. Thus, the calculation of commission payments did not take "negative

growth" into account until *after* the commissions had already been earned. Although Cohan and Schardt became aware that Medline deducted "negative commissions" that would reduce their income and even bring their commission income below zero to offset against future earnings, they did not stop working for Medline. The lower court erred in determining that their continued employment signaled acceptance of Medline's practices; because such acceptance is tantamount to a waiver of Cohan's and Schardt's right to be paid their earned commission income, any "implied agreement" is untenable.

In both New York and in California, the prompt and full payment of wages due an employee is a fundamental public policy of the state. See Weiner v. Diebold Gr., Inc., 173 A.D.2d 166, 167-68 (Sup. Ct. 1991); In re Jerich, 238 F.3d 1202, 1206-07 (9th Cir. 2001). Under both New York and California wage laws, an employee may not waive his or her right to full payment of earned compensation. Gennes v. Yellow Book of New York, Inc., 776 N.Y.S.2d 758, 759 (Sup. Ct. 2004); see, also Cohen v. Lord, Day and Lord, 75 N.Y.2d 95, 101 (Ct. App. 2989) (While parties are free to make any bargain they wish and are held to bargains made by them with eyes open, they are not free to enter into contracts which violate public policy); Cal. Lab. Code, § 219(a); Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1170 (9th Cir. 2006) (a party cannot waive a right if to do so would violate public policy).

Here, Cohan and Schardt entered into written Agreements and worked pursuant to Pay Plans that made it clear that commissions were earned upon customer payment to Medline, and then calculated based on growth year over year. Thus, by making deductions based on "negative commissions" that reduced earned income and brought Cohan and Schardt below zero to offset even future earnings, Medline failed to provide Cohan and Schardt with the full amount of wages that they earned per the controlling written instruments. Even if they had never questioned the

pay practices, which they did, they could not be permitted to waive their right to receive their earned compensation. The argument that by continuing to work (ostensibly because they needed the income to support their families), Cohan and Schardt tacitly agreed with Medline's practice of deducting from earned wages is akin to an employer failing to pay its employees minimum wage, and upon being sued arguing that the employees agreed to be paid less than minimum wage because they knew how much they were being paid but nevertheless continued to work. This sort of victim-blaming defies the letter and spirit of the wage laws at issue, which for that exact reason cannot be waived, and should not be supported by the Court.

The lower court disregarded Cohan and Schardt's argument that finding an implicit agreement to Medline's deviant payment structure would be tantamount to forcing an improper waiver of their right to full compensation in violation of public policy. However, this conclusion is premised wholly upon the lower court's erroneous and unjustified conclusion, described above, that Cohan and Schardt "ha[d] provided no evidence that they were entitled to a commission calculation that ignored negative sales growth. Instead, the evidence shows that they assented to the opposite approach." (D.E. 17 at p. 24.) In addition to ignoring the plain language of the written agreements, this logic is circular; the justification for finding that Cohan and Schardt "implicitly agreed" to the pay structure cannot be the purported fact that they "assented" to it. The parties' written Agreement and Pay Plans provided for the calculation of commissions based on growth, and Cohan and Schardt could not "assent" to waive their right to full payment of the earned wages per the calculation method described in the parties' agreements, in violation of public policy. In fact, the District Court specifically determined, and then disregarded in its analysis, that both Cohan and Schardt vehemently, consistently, and

vocally disagreed with the "negative commission" deductions over the years. (D.E. 107 at pp. 11-14.)

Notably, in determining that Cohan had impliedly agreed to Medline's "negative commission" structure, the lower court relied heavily upon Pachter v. Bernard Hodes Grp., Inc., 10 N.Y.3d 609, 617-18 (N.Y. 2008). (D.E. 107 at p. 25.) However, Pachter is inapposite. In that case, there was *no* written contract between the parties indicating when commissions would be "earned." Under those circumstances, which are not present in the instant case, the court analyzed whether the parties had an implied contract that deviated from the common law rule for determining when a commission is "earned." Id. at 617. Moreover, the types of deductions at issue in Pachter (adjustments for nonpayment by customers, the cost of the plaintiff's assistant, and miscellaneous work-related expenses) are completely different from the deductions that Medline took from Cohan's pay in this case. See Id. The Pachter plaintiff was not being made to insure his employer for business losses.

Likewise, the California cases cited by the lower court do not involve circumstances that are analogous to Schardt's claims. (See D.E. 107 at p. 26.) Unlike the plaintiff in Koehl v. Verio, Inc., 142 Cal. App. 4th 1313, 1330 (1st Dist. 2006), Schardt did not agree to a deduction that was part of her earned commissions. In addition, the compensation plan at issue here is not a simple policy of the nature described in Koehl or the other cases cited by the lower court, where the employees were advanced commissions that were later recouped when the predicate payments were not collected by the employer. In this case, Schardt *earned* her commissions as wages after customer payment to Medline on her sales, and her agreement with Medline did not provide for deductions based on a decline in sales. California's prohibition on wage deductions reflects the state's "strong public policy favoring the protection of employees' wages, including

amounts earned through commissions on sales." Sciborski v. Pac. Bell Directory v. Pac. Bell Directory, 205 Cal. Ct. App. 4th 1152, 1166 (2012) (citations omitted). These rights are nonnegotiable and cannot be waived by the parties' private agreement, whether written, oral, or implied. See Lab. Code, § 219(a).

The district court erred in concluding that Cohan and Schardt had implicitly agreed to Medline's compensation practices, simply because they did not quit their jobs as soon as their employer compensated them in a manner unlike that described in the controlling Employment Agreements and Pay Plans. Cohan and Schardt could not, as a matter of public policy, impliedly agree to waive their right to full compensation of their earned wages. Both Cohan and Schardt earned commissions upon payment to Medline for each of the sales in their territories, which were then calculated pursuant to the Pay Plans based on growth year over year.

## III. The District Court Erred in Concluding that Medline's Compensation Practices Did Not Violate the New York Labor Law

Pursuant to New York State Law, "[a] commission salesperson shall be paid . . . commissions and all other monies earned or payable in accordance with the agreed terms of employment." NYLL § 191(1)(c). Importantly, an employer may only make deductions from an employee's wages if such deductions are "expressly authorized in writing by the employee and are for the benefit of the employee." NYLL § 193(1). For employees paid by commission, commissions are considered "wages" subject to Section 193's restrictions as soon as those commissions are "earned." In determining whether commissions have been earned, in all instances a written instrument indicating when commissions are "earned" shall control the analysis. See Pachter, 10 N.Y.2d 609 (N.Y. 2008) ("*in the absence of a governing written instrument*, when a commission is 'earned' and becomes a 'wage' for purposes of Labor Law article 6 is regulated by the parties' express or implied agreement") (emphasis added).

As set forth above, it is clear from Cohan's Employment Agreement that his commissions were "earned" and thus became "wages" under the NYLL as soon as Medline received payment on his sales from its customers. It is nowhere in Cohan's Employment Agreement, Continued Employment Agreement, or annual Pay Plans that any amount would be deducted from Cohan's compensation based on a year-over-year decline in sales on existing accounts. Rather, those written instruments consistently and precisely indicate that commissions are based on "growth," more specifically "growth year over year." Regardless, Cohan clearly did not provide his contemporaneous written authorization for Medline to deduct amounts from his compensation due to a decline in sales. The lower court erred in finding that there was "no evidence" of such earnings or agreement, and that this determination should have been sufficient to find that Medline's practices did not run afoul of New York law.

Indeed, even if Medline's compensation practices *had* been reduced to writing in Mr. Cohan's Employment Agreement or the Pay Plans, which they were not, the practice of deducting commissions for existing accounts that did not experience year-over-year growth is nevertheless a per se violation of the New York Labor Law. Even if the parties had agreed – explicitly or implicitly – that Medline could deduct commissions based on a decline in year-over-year sales, employees cannot waive the protective provisions of § 193 of the Labor Law. Gennes, 776 N.Y.S.2d at 759. This precise compensation practice – otherwise known as the company taking a "charge back" against commissions, has been analyzed and rejected by New York courts. In Gennes, the plaintiffs were salespeople who challenged the defendant's written policy providing that commissions for existing accounts that were not renewed would be charged back their commissions on those accounts, against other earned commissions. Gennes, 776 N.Y.S.2d at 760. This is exactly the same thing that Medline did, with regard to Cohan's

commission payments on accounts with declining growth. The Gennes court was clear and explicit in its holding that an employer "cannot charge its employees against moneys already earned for the failure to renew accounts." Gennes, 776 N.Y.S.2d at 760 ("It is clear to this court that the issue at hand concerning "charge backs" is what the Section 193 was enacted to protect against"). In making its determination, the Gennes court noted, importantly, "employees would suffer negative economic consequences through no fault of their own if a business did not renew its subscription. Many reasons would account for such failure to renew, i.e., economic downturn, advertising with another publication, or misjudging the amount of business which advertisements were supposed to generate." Id. at 760.

Reaffirming the decision on appeal, the appellate division in Gennes explicitly clarified that "the defendant's compensation policy, which provided for the deduction from the plaintiff's earned commissions in order to compensate for the company's losses, was a violation of the Labor Law § 193." Gennes v. Yellow Book of New York, Inc., 23 A.D.3d 520, 521 (Sup. Ct. 2005) (citing Editz v. Nipkow & Kobelt, 264 A.D.2d 437 (Sup. Ct. 1999) (deductions from employee's commission due to customer's failure to pay violated the Labor Law)); see also Maldonado v. La Nueva Rampa, Inc., No. 10 Civ. 8195, 2012 WL 1669341, at *8 (S.D.N.Y. May 14, 2012) ("The purpose of § 193 is to prohibit employers from making unauthorized deductions from wages [and therefore] to place the risk of loss for such things as damaged, spoiled merchandise, or lost profits on the employer"). Indeed, compensation policies that are intended to shift the "risk of loss" from employers to employees are prohibited by § 193. Maldonado, 2012 WL 166341, at *8.

Gennes is squarely on-point, and is the only case analyzed by the lower court that addresses a compensation practice that precisely mirrors Medline's "negative commission"

deductions. Cohan was charged back commissions on any accounts that did not experience growth year-over-year, at the same rate at which he would have earned commissions had the account grown. The result for Medline was that Medline did not by practice pay any commissions on sales beyond the smallest volume of product sold to a customer – regardless of the cumulative volume of sales that a Sales Representative would have made over time. Thus, Medline's compensation practices sought to recoup the company's sales losses from Cohan – even when those losses were wholly out of Cohan's control.

Again, Medline's compensation practices are not akin to those in Pachter, 10 N.Y.2d 609. In that case, there was no written agreement between the parties, and the court found that the plaintiff had agreed to – and benefited from – the manner in which the defendant calculated her earned commission. Id. at 618. Here, the Employment Agreement, Continued Employment Agreement, and Pay Plans controlled, and moreover there was no benefit to Cohan in agreeing that Medline could cover its risk of loss by deducting "negative commissions" from his earned compensation. Because Cohan "earned" his commissions upon the receipt of payment to Medline by his accounts, no amounts (attributed to "negative commissions" or otherwise) could be deducted without meeting the very specific criteria of the Labor Law.

Because Medline's practice of subtracting commission payments from Cohan's compensation based on negative growth in his territory constituted an unlawful deduction in violation of the NYLL as a matter of law, and because Cohan did not agree – and could not have agreed – to such a practice, the lower court erred in finding that Medline was entitled to summary judgment on Cohan's claim under New York law.

## IV. The District Court Erred in Concluding that Medline's Practices Did Not Violate California Wage Law

As a California state resident who was responsible for sales primarily within a California territory, Schardt is entitled to the rights and protections afforded her as an employee pursuant to California's common law and wage laws contained in the California Labor Code. The Labor Code is clear, in that an employer may not collect or receive wages that have already been earned by performance of agreed-upon requirements. Cal. Lab. Code § 221; Steinhebel v. Los Angeles Times Communications, 126 Cal. App. 4th 696, 707 (2d Dist. 2005). The limited circumstances under which an employer can deduct money from an employee's wages include if the deduction is authorized in writing, *and* the money is conveyed to a third party for the benefit of the employee (e.g. for union dues or health insurance premiums). See Labor Code, § 224.

Commissions are wages within the meaning of section 221. Cal Lab. Code § 200 (wages are "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, piece, commission basis, or other method of calculation"). The contract between the parties will determine how commissions should be calculated and when a commission is considered "earned." See, e.g., Commeford v. Baker, 127 Cal. App. 2d 111, 118 (2d Dist. 1957) ("[o]f course, the right of salesman or any other person to commissions under given circumstances depends upon the terms of his contract for compensation"); see also DLSE Opinion Letter 2002.12.09-2 ("Commissions are due and payable after the reasonable conditions precedent of the employment agreement have been met"). As set forth above, it is clear from Schardt's Employment Agreements that her commissions were "earned" and thus became "wages" under the Labor Code as soon as Medline received payment on her sales from their customers. Once earned commissions were due and payable to Schardt, Medline had to comply with its obligation under the controlling written

instruments to provide Schardt with commission payments on sales growth. Likewise, Medline could not deduct money from Schardt's earnings, particularly below zero to carry forward and affect future earnings, for a decline in sales; permission for such a deduction is not set forth in the Agreements or Pay Plans, and Schardt's right to full compensation of her earned commission.

The prohibition on unlawful wage deductions in California's wage laws reflects "California's strong public policy favoring the protection of employees' wages, including amounts earned through commissions on sales." Sciborski, 205 Cal. Ct. App. 4th at 1166 (citations omitted). Indeed, commission compensation plans that provide for deductions that are unpredictable in nature or taken without regard to whether losses were due to factors beyond the employee's control are not permitted under California law. See, e.g., Hudgins v. Neiman Marcus Group, Inc., 34 Cal. App. 4th 1109, 1123-24 (1st Dist. 1995). An employer may not avoid a finding that an impermissible deduction policy is unlawful "simply by asserting that the deduction is just a step in its calculation of commission income." Id. Here, Medline's deduction policy is unlawful as it serves to insulate Medline from business losses by placing the financial burden directly on its sales employees.

Notably, while the type of compensation practice at issue in this case does not appear to have specifically been analyzed by the California courts (as it has in New York), an analogous if less punitive practice has been widely and uniformly denounced as unlawful. Namely, the practice of deducting amounts from employee commissions based on company losses (due to theft, return of merchandise, etc.). It is well established that California employers may not deduct amounts from an employee's compensation for losses where the employee has not engaged in dishonesty, willful misconduct, or gross negligence in causing the loss. See Quillian v. Lion Oil, 96 Cal. App. 3d 156 (1st Dist. 1979) (prohibiting deductions for losses beyond the

employee's control); Kerr's Catering Service v. Department of Industrial Relations, 57 Cal. 2d 319, 327-28 (1962) (holding that a policy of deducting commission pay based on losses beyond the employee's control is impermissible because such policies, in effect, make employees "insurers of the employer's merchandise, and the commissions earned by the employees which are subject to the deduction serve the same purpose as an employee's bond exacted by the employer to cover shortages"); Hudgins, 34 Cal. App. 4th at 1123 ("employees may not be made the insurers of business losses suffered by the employer"). Thus, even if only by implication, California wage law prohibits the more direct risk-shifting compensation practices employed by Medline in this case.

Further, Section 223 further provides that "[w]here any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or contract." Thus, it is unlawful for an employer to pay less than any contract or statute requires while purporting to pay the required wage. Schardt contracted with Medline to be compensated her earned commissions; not to owe commission payments to Medline in the event of a decline in sales. The amounts of those commissions were determined by Schardt's commission percentage and her ability to grow sales. Medline's practice of deducting commission payments from Schardt's earned commissions was knowingly confusing and veiled by Medline, and resulted in Schardt being paid less than she was owed pursuant to her Employment Agreement. This is a failure to pay wages, akin to a breach of contract. Medline chose not to clarify or make any substantive changes to their Employment Agreements or Pay Plans for the duration of Schardt's employment. This practice of intentionally failing to explicitly inform Sales Representatives of their compensation practices,

and thereby secretly paying lower amounts in commission compensation than what is described in Employment Agreements and Pay Plans, is impermissible under the Labor Code.

Because Medline's practice of subtracting commission payments from Schardt's compensation based on negative growth in her territory resulted in an unlawful failure to pay full earned wages in violation of California wage law, and because Schardt did not agree – and could not have agreed – to such a practice, the lower court erred in finding that Medline was entitled to summary judgment on Schardt's claim under California law

## CONCLUSION

For the foregoing reasons, the order of the district court granting summary judgment against Cohan and Schardt should be reversed and remanded for further class discovery and a jury trial on Count II of their Third Amended Complaint.

Dated: June 17, 2016

CAFFARELLI & ASSOCIATES LTD.

/s/ Alejandro Caffarelli
Alejandro Caffarelli, IL Bar No. 06239078
Lorrie T. Peeters, IL Bar No. 06290434
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Telephone (312) 763-6880
acaffarelli@caffarelli.com

*Attorneys for Plaintiffs-Appellants*

**REPRODUCTION OF STATUTES, RULES, AND REGULATIONS**
**PURSUANT TO FED. R. APP. P. 28(f)**

**California Labor Code §§ 200, 219(a), 221, 223, and 224**

**200.** As used in this article: (a) "Wages" include all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

**219(a).** Nothing in this article shall in any way limit or prohibit the payment of wages at more frequent intervals, or in greater amounts, or in full when or before due, but no provision of this article can in any way be contravened tor set aside by a private agreement, whether written, oral, or implied.

**221.** It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee.

**223.** Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract.

**224.** The provisions of Sections 221, 222, and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages when the employer is required or empowered so to do by state or federal law or when a deduction is expressly authorized in writing by the employee to cover insurance premiums, hospital or medical dues, or other deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute, or when deduction to cover health and welfare or pension plan contributions is expressly authorized by a collective bargaining or wage agreement.

Nothing in this section or any other provision of law shall be construed as authorizing an employer to withhold or divert any portion of an employee's wages to pay any tax, fee, or charge prohibited by Section 50026 of the Government Code, whether or not the employee authorizes such withholding or diversion.

**New York Labor Law §§ 191(1)(c) and 193(1)**

**191(1)(c).** Commission salespersons. A commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned; provided, however, that if monthly or more frequent payment of wages, salary, drawing accounts or commissions are substantial, then additional compensation earned, including but not limited to extra or incentive earnings, bonuses and special payments, may be paid less frequently than once in each month, but in no event later than the time provided in the employment agreement or compensation plan. The employer shall furnish a commission salesperson, upon written request, a statement of

earnings paid or due and unpaid. The agreed terms of employment shall be reduced to writing, signed by both the employer and the commission salesperson, kept on file by the employer for a period not less than three years and made available to the commissioner upon request. Such writing shall include a description of how wages, salary, drawing account, commissions and all other monies earned and payable shall be calculated. Where the writing provides for a recoverable draw, the frequency of reconciliation shall be included. Such writing shall also provide details pertinent to payment of wages, salary, drawing account, commissions and all other monies earned and payable in the case of termination of employment by either party. The failure of an employer to produce such written terms of employment, upon request of the commissioner, shall give rise to a presumption that the terms of employment that the commissioned salesperson has presented are the agreed terms of employment.

**193(1).** No employer shall make any deduction from the wages of an employee, except deductions which:

a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or

b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.

**CERTIFICATE OF COMPLIANCE WITH THE TYPE VOLUME LENGTH REQUIREMENTS OF FED. R. APP. P. 32(a)(7)(B)(i)**

The undersigned counsel of record certifies that the Opening Brief of Plaintiffs-Appellants Cohan and Schardt is thirty (30) or fewer pages long and contains fewer than 8,535 words and 718 lines of text.

/s/ Alejandro Caffarelli
Alejandro Caffarelli
Attorney for Plaintiffs-Appellants Cohan and Schardt

Alejandro Caffarelli, #06239078
Lorraine T. Peeters, #06290434
Caffarelli & Associates Ltd.
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Tel. (312) 763-6880

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that he caused a copy of the attached document, Brief of Plaintiffs-Appellants David Cohan and Susan Schardt, to be served on the party below by electronically filing with the Clerk of the U.S. Court of Appeals for the Seventh Circuit on June 17, 2016.

Frederick L. Schwartz ARDC # 06204341
Amy S. Ramsey ARDC # 6270557
Amy D. Rettberg ARDC # 6289362
Christina A. Andronache ARDC # 6292289
LITTLER MENDELSON, P.C.
321 N. Clark St., Ste. 1000
Chicago, IL 60654
Tel. (312) 372-5520

/s/ Alejandro Caffarelli
Alejandro Caffarelli
Attorney for Plaintiffs-Appellants Cohan and Schardt

No. 16-1850

---

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

DAVID COHAN and SUSAN SCHARDT,

*Plaintiffs-Appellants*,

v.

MEDLINE INDUSTRIES, INC., *et al.*,

*Defendants-Appellees.*

---

**Appeal from the United States District Court**
**For the Northern District of Illinois, Eastern Division**

**Case No. 1:14-cv-01835**
**The Honorable John Robert Blakey**

---

# REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS DAVID COHAN AND SUSAN SCHARDT

---

Alejandro Caffarelli
Lorraine T. Peeters
Caffarelli & Associates Ltd.
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Tel. (312) 763-6880

*Counsel for Plaintiffs-Appellants*

---

## CIRCUIT RULE 30 CERTIFICATION

The undersigned counsel of record certifies that all materials required by Circuit Rule 30(a) and (b) are included in the Short Appendix.

/s/ Alejandro Caffarelli
Alejandro Caffarelli
Attorney for Plaintiffs-Appellants Cohan and Schardt

Alejandro Caffarelli, #06239078
Lorraine T. Peeters, #06290434
Caffarelli & Associates Ltd.
224 S. Michigan Ave., Ste. 300
Chicago, IL 60604
Tel. (312) 763-6880

## APPENDIX TABLE OF CONTENTS


Circuit Rule 30 Certification ........................................................................................ ii

Cohan 1999 Employment Agreement (D.E. 94-2 at 110-118) ......................................... App-001

Cohan 2007 Continued Employment Agreement (D.E. 94-2 at 120-122) ........................ App-010

Schardt 2001 Employment Agreement (D.E. 94-2 at 124-132) ....................................... App-013

Schardt 2006 Employment Agreement (D.E. 94-2 at 134-141) ....................................... App-022

District Court's Order Granting Medline's Motion for Summary Judgment (D.E. 107) ... App-030

# MEDLINE INDUSTRIES, INC.
# EMPLOYMENT AGREEMENT

#712

THIS AGREEMENT is entered into at Mundelein, Illinois, this 25th day of March 1999, by and between Medline Industries, Inc., an Illinois corporation having its principal office at One Medline Place, Mundelein, Illinois 60060 (herein referred to as "Medline"), and DAVID COHAN of 3 DAHILL ROAD, OLD BETHPAGE, NY 11804 (hereinafter referred to as "Salesperson").

WHEREAS, Medline is engaged in the distribution and sale of health care products, some of which are manufactured by or for it; and

WHEREAS, Medline desires to employ Salesperson to assist in the distribution and sale of such products by Medline, and Salesperson desires to become so employed, all on terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of the foregoing recitals, of the provisions hereinafter set forth, and of other good and valuable considerations, the receipt and sufficiency of which are mutually acknowledged, the parties hereto agree as follows:

1. **EMPLOYMENT**

Medline hereby employs Salesperson, and Salesperson hereby agrees to become and be employed by Medline, as one of its salesmen, upon and subject to the terms and conditions hereinafter set forth.

2. **TRAINING**

(a) If Salesperson has not acted as a salesperson for Medline prior to the date hereof, Medline shall provide and Salesperson shall undergo Medline's regular training program for new salesmen. Until full completion of such program, Salesperson shall be considered employed by Medline as a sales trainee.

(b) Medline shall bear and pay the costs of Salesperson's travel to and from the Chicago Metropolitan area, and the costs of his travel, lodging, and maintenance while a sales trainee, subject to reasonable limitations on said costs as prescribed by Medline.

(c) After ninety (90) days of employment, Salesperson shall cease to be a sales trainee and shall commence the performance of his duties as one of Medline's salesmen, in accordance with the provisions of this Agreement.

3. **DUTIES of Salesperson**

(a) Salesperson shall solicit orders from customers and potential customers in the territory hereinafter referred to for the purchase of all products and services now or hereafter offered by Medline or any of its subsidiaries or affiliates. All such orders shall be promptly transmitted by Salesperson to Medline's principal office, for acceptance or rejection, in whole or in part, as Medline in its sole discretion deems advisable.

(b) No order shall be binding upon Medline unless and until it shall have been accepted by Medline at its principal office as aforesaid, and only to the extent of such acceptance and subject to any conditions or limitations imposed thereon. No representations, warranties, promises or agreements made by Salesperson to or with any customer shall be valid unless set forth in a written order which is accepted by Medline at its principal office. Salesperson shall under no circumstances collect any money from customers, unless directed to do so in writing by a duly authorized officer of Medline.

(c) Salesperson shall visit the customers in his territory on a regular and frequent basis, and shall fully service and satisfy their needs in relation to the products and services now or hereafter offered by Medline or any of its subsidiaries or affiliates. Salesperson will also use his best efforts to establish new customers in his territory for such products and services.

(d) Salesperson will from time to time attend such sales meetings, seminars, training programs, and other meetings as Medline may reasonably prescribe, provided that if attendance there at requires Salesperson to travel outside his territory, then Medline shall pay the cost of Salesperson's travel to and from, and his lodging and maintenance while in such place, subject to reasonable limitations imposed by Medline on the amounts thereof. Medline bears no liability or responsibility for any injury to any party, including salesperson, that results from any actions taken during any unsupervised period of time during meetings.

(e) Salesperson will devote his full time and effort to the performance of his duties under this Agreement. During the term of this Agreement, Salesperson shall not engage in or devote time to any other business, occupation, venture, or employment whatever, except that Salesperson may attend to personal investments not requiring any direct or indirect involvement in the management or operation of any business or venture, and may engage to a reasonable degree in charitable, civic and similar pursuits not entered into for profit or monetary compensation. The provisions of the immediately preceding sentence shall be deemed an express and separable negative covenant capable of enforcement as such by equitable relief.

(f) During the term of any notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, Medline may, solely at its option, assign alternative duties to Salesperson, including duties of an administrative nature. In the event Salesperson is required to travel outside of his territory to perform such alternative duties, Medline shall pay the cost of Salesperson's travel to and from his destination, and his lodging while at such destination, subject to reasonable limitations imposed by Medline on the amounts thereof.

4. **TERRITORY**

(a) Salesperson shall perform the duties specified in Paragraph 3 with respect to customers located within the territory described in Paragraph 20 attached hereto and made a part hereof, except for any customers within said territory who may be excluded by the terms of said Paragraph 20.

(b) If at any time, in the reasonable judgment of Medline, Salesperson shall fail to adequately cover, service, or sell in any portion of said territory, or shall fail to adequately service or sell to any existing or potential customer or customers within said territory, Medline may in its discretion withdraw said portion of the territory or said customer or customers from the territory described in Paragraph 20. Medline may at any time thereafter in its discretion reassign said portion of the territory or such customer or customers to Salesperson.

(c) Medline shall have the right at any time to withdraw from Salesperson's territory dealers, distributors, or any other customers other than health care institutions. Further, Medline shall have the right from time to time to establish and maintain sales personnel specializing in the sale of certain categories of products and/or services, and Salesperson shall cooperate with and assist such personnel in the sale of such Paragraph 6(a). Further, any contrary provision of this Agreement notwithstanding, Medline shall have the right at any time to withdraw certain products or services now or hereafter offered by Medline or any of its subsidiaries or affiliates from among those for which Salesperson shall be entitled to solicit orders from the customers within his territory, in which event Medline may designate other sales personnel to solicit customers within Salesperson's territory for the products or services now or hereafter offered by Medline or any of its subsidiaries or affiliates withdrawn for Salesperson.

(d) If at the time of execution of this Agreement, Salesperson is a sales trainee and no territory is yet established in Paragraph 20, this Agreement shall nevertheless be effective in all other respects, but Medline shall propose to Salesperson in writing, not later than the date on which Salesperson ceases to be a sales trainee, a territory to be incorporated in Paragraph 20. If Salesperson accepts such territory in writing, it shall be deemed to be incorporated into Paragraph 20 and to be a part of this Agreement, whether or not physically so incorporated therein. If Salesperson fails to accept such territory in writing within ten days after receipt of written notice thereof, then either Medline or Salesperson may within a reasonable time thereafter terminate this Agreement.

(e) If at any time or times hereafter, Medline amends or modifies the territory described in Paragraph 20 or any customer exclusion recited therein, or add a new territory thereto or substitute another territory therefore, or if Medline shall withdraw any portion of the territory or any customer or customers therein as provided in paragraphs (b) and (c) above, all references in this Agreement to the territory described in Paragraph 20 shall thereafter be deemed to refer to such territory as so amended, modified, reduced, or enlarged, or to such new territory added to or substituted therefor.

(f) Salesperson will be given a sales quota and their performance in relation to that sales quota will be one of a number of standards of performance on which they will be judged.

5. **EXPENSES**

(a) Except as expressly provided in Paragraph 3(d), Salesperson shall bear and pay all expenses incurred in the performance of his duties as a salesperson, including but not limited to automobile and other travel expense; lodging, meals and maintenance away from home; entertainment; telephone calls to and from customers and to Medline; expenses of Salesperson's home office; and necessary catalogues, samples, cases, and supplies other than those which Medline may from time to time elect to furnish without cost to Salesperson.

(b) Salesperson shall maintain in force and pay the premiums for policies of public liability and property damage insurance relating to use of Salesperson's automobile and to all other activities of Salesperson on behalf of Medline, in solvent and reputable companies and with limits of liability satisfactory to Medline, which policies shall name Medline an additional insured and shall not be canceled without at least ten days prior written notice by the insurer to Medline.

(c) Salesperson shall have no authority to incur any expenses on behalf of Medline or to bind Medline with respect of payment thereof, and shall not make any representation to the contrary to any third party.

(d) If Medline at any time pays any item or items of expense which Salesperson is obligated hereunder to bear and pay, such payment shall not bind Medline to make any other payments in the future with respect to the same or any similar item or items of expenses.

(e) If Medline requires any documentation in order to reimburse expenses, Salesperson will provide such documentation within a prescribed time frame.

6. **COMPENSATION**

(a) Subject to the provisions hereafter set forth, Medline shall pay to Salesperson commissions with respect to the collections of all sales made by Medline to customers in the territory described in Paragraph 20, except for customers excluded by the terms of said Paragraph 20, provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties as a salesperson hereunder and is on or before the effective date of termination of this Agreement under any circumstances. Salesperson shall be entitled to a commission on any sale as set forth herein, irrespective of whether Salesperson shall have been responsible for such sale, provided however, that if a sale is made in whole or in part through the efforts of one or more other employees of Medline specializing in the sale of certain categories of products and/or services as provided in Paragraph 4(c), then the commission applicable to such sale shall be apportioned between Salesperson and such other employee or employees on a basis deemed equitable by Medline.

(b) Medline will furnish to Salesperson from time to time price lists covering the products offered by Medline showing, among other things, the selling price for each product and the base cost associated therewith as determined by Medline. Medline may at any time add products to or delete products from such price lists or change any of the information contained thereon, including, without limitation, changes in the base cost for any product.

(c) For the purpose of commission computations, the "selling price" of any item shall be defined to mean the gross sales price actually charged the customer, exclusive of sales taxes, use taxes, gross receipts taxes, or other taxes charged directly to the customer, and minus any and all discounts, rebates, and trade-ins and other allowances, other than discounts for prompt payment or similar cash discounts.

(d) In case of sale of any item with respect to which Medline shall incur freight or other charges to transport the item to the customer, then unless such freight or other charges are reimbursed by the customer to Medline separate from and in addition to the selling price, the commission which would otherwise be payable to Salesperson thereon shall be reduced by an amount equal to one-third of such freight or other transportation charges.

(e) In the event an order for an item is submitted by Salesperson and accepted by Medline and sold at a selling price different than the selling price set forth for such item in Medline's price list, then the rate of commission payable to Salesperson thereon shall be such as Medline determines to be equitable, considering the actual selling price, and base cost associated therewith, in relation to the selling price set forth in Medline's price list.

(f) Except as otherwise provided in Subparagraph (i) below, commissions on sales for which the collections are received by Medline prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.

(g) In the reasonable judgment of Medline, if any discount, rebate, product return allowance or other allowance of any kind not previously taken into account in computing commissions payable to Salesperson is granted to a customer, then Medline shall have the right to charge to Salesperson (and in its discretion to offset against any future compensation which may become payable to him) the amount of commission attributable to any such uncollectible amount, discount, rebate, product return allowance or other allowance of any kind.

(h) Medline may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, Medline may periodically vary the amount of salary and/or the rate of commission pursuant to such election.

(i) Subject to modification from time to time, and subject to subparagraphs (c)-(h) above, the commission compensation payable by Medline to Salesperson shall be in accordance with the commission schedule set forth in Paragraph 21.

(j) Medline may, solely at its option, in lieu of permitting Salesperson to continue his duties as provided in Paragraph 3(a)-(f) of this Agreement, elect to compensate Salesperson to perform alternative duties as provided in Paragraph 3(f) during the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement at a monthly rate equal to the average monthly earnings of Salesperson during the three months immediately preceding the month in which either party gives the other notice of termination.

(k) During the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, commissions shall be deemed earned by Salesperson only if collected prior to the effective date of termination of this Agreement under any circumstances. All commissions so earned during the term of such notice period shall be paid to Salesperson, provided Medline receives actual payment from the customer prior to termination date. Commissions due to Salesperson in accordance with this subparagraph after the termination of Salesperson's employment shall be paid to Salesperson as promptly as possible.

(l) Medline may, but shall be under no obligation to, from time to time elect to award Salesperson certain types and amounts of discretionary bonus compensation, in addition to the compensation provided for in subparagraphs (a)-(k) above. Salesperson's eligibility to receive these bonuses is based on their compensation status (full commission salesperson = 100% payout and salary salesperson = 50% payout). To be eligible for any bonus is contingent upon continued employment and when said bonus is paid out.

(m) In the event Salesperson becomes indebted to Medline for any reason in connection with his employment hereunder, Medline reserves the right to offset any such indebtedness against any compensation due to Salesperson from Medline. Such indebtedness shall include but not be limited to certain customer charges and credits for which Salesperson is liable in accordance with Medline's policy with respect thereto and any other losses sustained by Medline for which Salesperson is responsible. Medline reserves the right to hold Salesperson's final compensation payment until all of Salesperson's customer accounts have been audited to Medline's full satisfaction and any sums due to Medline as a result thereof, or otherwise, have been accurately calculated for offset purposes.

## 7. MEDLINE'S PROPERTY AND CONFIDENTIAL INFORMATION

(a) All tangible items furnished to Salesperson from time to time in connection with the performance of his duties, including but not limited to samples, catalogues, price lists, cases, computer software and it's licenses and selling or promotional aids, shall at all times remain the sole property of Medline. All such items are entrusted by Medline to Salesperson for the limited purpose of enabling him to perform his duties hereunder, and Salesperson shall not, either during or after the term of this Agreement, use or permit any of the same to be used for any other purpose. Upon the demand of Medline at any time, or upon the termination of this Agreement, under any circumstances, Salesperson shall forthwith deliver all such items to Medline at its office in Mundelein, Illinois. If Salesperson fails or refuses to do so, Medline shall have the right to recover from Salesperson as liquidated damages the sum of One Thousand Dollars ($1,000.00), which the parties agree represents a reasonable estimate of the cost to Medline of replacing such items, provided however that neither the exercise nor the non-exercise of such remedy shall impair any other remedy which Medline may have, at law or in equity, for the enforcement of either the provisions or this paragraph (a), or any other provision of this Agreement.

(b) All information imparted to Salesperson by Medline or otherwise obtained by Salesperson at any time relating to Medline's methods of doing business, its costs, sources of supply, manufacturing, marketing, and selling techniques, computer programs, inventory methods, billing procedures, any trade secrets, product ideas, pricing and commission data, customer names and lists, customer requirements and purchases, and other customer data, including, without limitation, information from third parties that Medline is obligated to keep secret, (The "Confidential Information") is revealed and entrusted to Salesperson in confidence solely in connection with and for the purposes of his employment on behalf of Medline hereunder. Confidential Information do not include any information that is or may become know to Salesperson or to the public from sources outside Medline and through means other than a breach of this Agreement. Salesperson agrees not to disclose, and to take all precautions necessary to prevent the disclosure of Confidential Information to any unauthorized individual or organization inside or outside Medline of all Confidential Information known to Salesperson, both during and after the term of this Agreement. Without limiting the generality of the foregoing, upon the termination of this Agreement under any circumstances, Salesperson shall forthwith deliver to Medline all lists, records, materials, notes and other tangible items that contain, relate to or are connected in any way with Confidential Information, as described above, and shall not retain any copies thereof.

8. **PROHIBITIONS REGARDING MEDLINE CUSTOMERS AND EMPLOYEES**

(a) It is understood and agreed by Salesperson that all business relationships and goodwill now existing with respect to customers of Medline to be served by Salesperson hereunder, whether or not created by Salesperson, and all such relationships and goodwill which may hereafter be created or enhanced by Salesperson in the course of his employment hereunder, constitute proprietary rights and interests of Medline, and shall inure to the sole benefit of, and are and shall at all times remain the sole property of Medline. Accordingly, Salesperson agrees that during the term of this Agreement he will not, directly or indirectly, solicit orders from, sell, or render services to any customer solicited, sold or serviced by Salesperson in the course of his employment by Medline, either as a sales representative or as a sales trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by Medline or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, form, or corporation to do any of the aforesaid acts.

(b) Medline and Salesperson desire to enter into an employment relationship involving full and open communications and mutual trust. Salesperson desires to encourage Medline to make available to him all pertinent confidential information concerning Medline's existing customers (much of which has been acquired at great effort and expense over a number of years) including pricing, costs, and other confidential information, which Medline has taken appropriate steps to maintain as confidential. Accordingly, for a period of one year beginning on the termination of this Agreement under any circumstances, Salesperson agrees that he will not, directly or indirectly, solicit orders from, sell or render services in the restricted geographical area defined hereafter to any customer solicited, sold, or serviced by Salesperson in the course of his employment by Medline, either as a sales representative or as a sale trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by Medline or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, firm or corporation to do any of the aforesaid acts.

(c) During the term of this Agreement and for the further period of one year beginning on the termination of this Agreement under any circumstances, Salesperson will not, directly or indirectly, solicit or induce any officer, sales representative, or other employee of Medline or any subsidiary or affiliated corporation to leave his employment, nor will Salesperson in any such capacity hire or cause to be hired any person who within one year prior thereto shall have been employed as an officer, sales representative, or other employee of Medline or any subsidiary or affiliated corporation, for any employment in a line of business similar to that conducted by Medline, nor shall Salesperson directly or indirectly aid or assist any other person, firm, or corporation to do any of the aforesaid acts.

(d) The provisions of this Paragraph 8 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of Paragraph 7.

(e) In addition to any and all other remedies which may be provided by law, Medline shall have the right to restrain the breach of any provision of Paragraphs 7 or 8 by injunction in any court of competent jurisdiction.

(f) As used in this Paragraph 8, the phrase "any product or service sold by Medline or any subsidiary or affiliated corporation" shall mean those products or services which Salesperson is from time to time authorized to sell by Medline or any subsidiary affiliated corporation either during the term of this Agreement or within one year prior to the termination of this Agreement, whichever period is shorter.

(g) Notwithstanding the foregoing, in the event that any part of the covenants set forth in Paragraph 8 shall be held to be invalid or unenforceable, the remaining parts hereof shall nevertheless continue to be valid and enforceable as though the invalid and unenforceable part had not been included herein. In the event that any provision of this Paragraph 8 relating to the time period and/or area of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time periods or areas such court deems reasonable and enforceable, such time period and/or area shall be deemed to become and thereafter be the maximum time period and/or which such court deems reasonable and enforceable.

9. **REIMBURSEMENT OF MEDLINE'S EXPENSES**

(a) Salesperson acknowledges that Medline has paid or incurred an employment agency fee to «AGENCY» in the amount of «FEE» with respect to employment of Salesperson.

Salesperson agrees that if his employment hereunder is terminated voluntarily by salesperson or for cause by Medline within 18 months after commencement of his duties as a salesperson, he will reimburse Medline for all or part of such amounts in accordance with the following schedule:

| If Voluntary Termination Occurs | Percent to be Reimbursed |
|---|---|
| Within 3 months | 100% |
| More than 3 months but within 6 months | 75% |
| More than 6 months but within 18 months | 50% |
| If Termination Occurs for Cause | 100% |

If Salesperson voluntarily terminates his employment prior to the employment agency fee due date, Salesperson will not be held responsible for such fees.

Paragraph 9a (if applicable) does not supersede previous Employment Agreement.

(b) If Salesperson fails to satisfactorily complete the training course pursuant to Paragraph 2 hereof, or if Salesperson after satisfactorily completing such course fails for any reason (including but not limited to rejection of a territory proposed by Medline pursuant to Paragraph 4(d) to enter in good faith upon the performance of his duties as a salesperson hereunder, he shall reimburse Medline for 100% of all amounts, if any, paid or incurred by it for employment agency fees as aforesaid.

(c) Upon the request of Medline at any time, Salesperson shall execute and deliver to Medline a promissory note with confession of judgment clause, in form prescribed by Medline, evidencing any or all of Salesperson's potential obligations under this Paragraph 9.

10. **TERMINATION**

(a) The term of this Agreement shall continue indefinitely, provided however, that either Salesperson or Medline may terminate this Agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calender days prior to the effective date of termination specified in such notice.

(b) In addition to the right of termination provided in subparagraph (a) above, Medline may terminate this Agreement forthwith and without prior notice to Salesperson in the event Salesperson commits any act of embezzlement, theft, fraud, or dishonestly, related to his employment, or in the event Salesperson commits any material breach of this Agreement.

(c) This Agreement shall terminate automatically upon the death of a Salesperson.

(d) Upon the termination of this Agreement under any circumstances, Salesperson (or his estate) shall be entitled only to those unpaid commissions, if any, earned by him (as defined in paragraph 6(f) on or prior to the date of such termination, subject to any proper reductions thereof as provided in Paragraph 6, and to all unpaid salary, if any, accrued for any period prior to such termination. Medline may offset against any such amounts due Salesperson any and all amounts due or which may become due from Salesperson to Medline. Salesperson (or his estate) shall in no event be entitled to commissions with respect to any amount collected from a customer after the date of termination, irrespective of whether any purchase order, contract, or other commitment relating thereto shall have been entered into prior to the date of termination. If an election, during all or any portion of the notice period provided in subparagraph (a) above, is made by Medline under Paragraph 6(j) of this Agreement, Salesperson shall only be entitled during the duration and upon the termination of this Agreement to the compensation provided for in Paragraph 6(j), less any applicable offset amount provided for herein, any provision of this subparagraph notwithstanding.

(e) In the event Salesperson terminates or abandons his employment hereunder under any circumstances without providing to Medline the full fourteen (14) days written notice of termination provided for in Paragraph 10(a) above, he shall pay to Medline, because damages would be difficult to estimate and ascertain, upon demand, the sum of Five Thousand Dollars ($5,000.00) as liquidated damages, and not as a penalty for such breach, which the parties agree fairly approximates the expense, damages or injury which Medline is likely to sustain prior to and/or in obtaining other service equivalent to the service that was promised and not performed by Salesperson, with a reasonable allowance for additional compensation to cover any consequential injuries to Medline arising as a proximate and foreseeable consequence of Salesperson's breach, which amount, or any portion thereof, may be deducted form any compensation otherwise due and payable to Salesperson.

11. **REMEDIES CUMULATIVE**

Any and all remedies granted to Medline herein or provided at law or in equity shall be cumulative with all other remedies, and neither the exercise nor non-exercise by Medline of any such remedy shall preclude or impair the exercise by it of any other such remedy.

12. **WAIVER**

The waiver by Medline of any right hereunder or of any breach of this Agreement shall not operate as or be construed as an amendment of this Agreement or as a waiver of any other than existing or future right or breach.

13. **ENTIRE AGREEMENT**

This written memorandum constitutes the entire agreement of the parties with respect to the subject matter hereof, and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein.

14. **AMENDMENT**

This Agreement may be amended only by a writing signed by Salesperson and by a corporate officer of Medline.

15. **SURVIVAL OF PROVISIONS**

Any provision of this Agreement which by its terms or by reasonable implication is to be or may be performed or effective after the termination of this Agreement shall be deemed to survive such termination.

16. **SEPARABILITY AND MODIFICATION**

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised form this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

All notices hereunder shall be either delivered personally to Salesperson or to the President or Vice Presidents of Sales, or shall be sent by United States mail, postage prepaid, addressed to Medline at its principal place of business and addressed to Salesperson at the address last shown on Medline's books as the residence of Salesperson. Any such notice shall be deemed given and effective when received.

17. **BINDING EFFECT**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and there respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by Salesperson.

18. **GOVERNING LAW**

This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose.

19. **COUNTERPARTS**

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute buy one and the same agreement.

20. **TERRITORY**

Territory to consist of accounts listed on Salesperson's current Customer Listing Report. This report will always be made available to the Salesperson by Medline at any time.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

ATTEST:

Vice President

JOSEPH BECKER
VP HUMAN RESOURCES

MEDLINE INDUSTRIES, INC.

By:________________
President

4/17/99
Salesperson

712

## AGREEMENT REGARDING CONTINUED EMPLOYMENT

This Agreement Regarding Continued Employment (hereinafter "Agreement") is entered into this 26th day of November, 2007, between David Cohan, on behalf of himself, his heirs, agents, representatives, executors and administrators (hereafter "Employee"), and Medline Industries, Inc., its parents, subsidiaries, affiliates, divisions, predecessors and successors, and all of their present and former trustees, officers, directors, employees, assigns, agents and representatives (collectively referred to hereinafter as "Medline").

WHEREAS, Employee has been employed by Medline for a period of time; and

WHEREAS, the parties desire to modify amicably their employment relationship;

NOW, THEREFORE, in consideration of the covenants contained herein, the parties agree as follows:

1. **Terms of Continued Employment:** Employee will transition from the General Line sales force to the Advanced Wound Care ("AWC") sales force. Employee will continue to be an employee "at will" and will continue to be subject to the employment agreement executed on March 25, 1999. This Agreement does not terminate or supersede the employment agreement, and does not amend the employment agreement or any other agreement between Employee and Medline, except as expressly provided herein. For avoidance of doubt, this Agreement does not provide Employee with any promise of continued employment for a specific duration of time, or any promise of payments of any kind beyond the termination of his employment. The following terms will apply to Employee's continued employment with Medline, and in the event of any inconsistency between these terms and the terms in the employment agreement or any other agreement between Employee and Medline, these terms shall control:

- Base salary of $60,000 in 2008.
- Commission plan based on sales growth year over year for assigned territory.
- Guaranteed draw of $5,000 minimum per month against commissions for the first 18 months.
- Start date in AWC sales force of December 3rd, 2007.
- Participation in the AWC "spiff" program and annual performance bonus program.
- Car allowance $600/month (paid via paycheck, $300/pay period).
- Reimbursement of normal and customary business expenses per the AWC guidelines.
- 401K, vacation time, health insurance and other benefits remain unchanged.
- Paid commissions and spiffs earned on General Line territory through November 30, 2007.
- If General Line territory finishes above 100% of quota, paid the prorated amount based on 11 months; between 99.3% and 100%, paid 40% prorated on 11 months; below 99.3%, no payment.

2. **Waiver and General Release:** Employee does hereby fully, finally and forever waive and unconditionally release, acquit and discharge Medline from any and all claims, complaints, causes of action, demands, suits, liabilities, or obligations of every kind or nature arising out of his employment

with Medline on or prior to the date of this Agreement, including but not limited to claims of wrongful or tortious termination; violation of public policy or related matters; breach of implied or express employment contract and/or estoppel; employment discrimination and/or retaliation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000e et seq.; the Age Discrimination in Employment Act, as amended by the Older Workers Benefits Protection Act, 29 U.S.C. § 621 et seq.; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.; the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.; the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.; the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq.; or any other federal, state or local statute, regulation or ordinance pertaining to discrimination in employment, or the termination of employment; libel, slander, defamation, invasion of privacy, interference with contract or prospective economic advantage, intentional or negligent infliction of emotional distress or any other theory under the common law of any state; unpaid wages, vacation, or other compensation of any kind under applicable federal, state or local law; and any and all claims for attorneys' fees and costs incurred in relation to such claims. Medline does hereby fully, finally and forever waive and unconditionally release, acquit and discharge Employee from any and all claims, complaints, causes of action, demands, suits, liabilities, or obligations of every kind or nature arising out of his employment with Medline on or prior to the date of this Agreement. In the event Medline terminates Employee for any reason other than cause before June 30, 2008, Medline shall pay Employee $80,000.00 in severance, provided that Employee agrees to and executes an updated and restated waiver and release. For purposes of this Agreement, the term "cause" means: Employee's gross misconduct, commission of a felony, Employee's violation of any material provision of any agreement with Medline, Employee's unreasonable refusal to carry out his obligations in the Employment Agreement, Employee's misappropriation of Medline property, or Employee's acts of insubordination or dishonesty that Employee knows or should reasonably know to be detrimental in material way to Medline's interests.

3. **Binding Effect/Assignability:** This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and assigns. This Agreement shall not be assignable, in whole or in part, by either party.

4. **Acknowledgments:** Employee hereby acknowledges that he is entering into this Agreement knowingly and voluntarily and without reliance on any premise, statement, or inducement (other than set forth herein) by Medline, and further acknowledges that: (1) this Agreement is written in a manner understood by Employee and that he fully understands all of the provisions of this Agreement; (2) this Agreement refers to and specifically waives Employee's rights under the Age Discrimination in Employment Act, as amended ("ADEA"); (3) by signing this Agreement, Employee has not waived any rights or claims under the ADEA arising after the effective date of this Agreement; (4) Employee has received valuable consideration in exchange for the waiver and release of claims included in this Agreement which substantially exceeds amounts that Employee would otherwise be entitled to receive from Medline; (5) Employee has been advised in writing (by this document) to consult with an attorney prior to executing this Agreement, and has in fact consulted with an attorney regarding this Agreement; (6) Employee may take up to 21 days from receipt of this Agreement to consider whether to sign this Agreement; (7) Employee has been notified that he may revoke this Agreement by delivering written notice to Mr. Joseph Becker, Vice President/Human Resources, within seven calendar days of

Employee's execution of this Agreement and if no revocation is so delivered within that seven day period, this Agreement will become effective on the eighth day following the date the Employee executes this Agreement, and will thereafter remain in full force and effect on a non-revocable basis; (8) this Agreement, and the waiver and release set forth herein, fully complies will all of the requirements of the Older Workers Benefit Protection Act; and (9) Employee is legally competent to execute this Agreement.

5. __Counterparts__: This Agreement may be executed in separate counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

WHEREFORE, the parties have affixed their signatures below.

EMPLOYEE

12/7/07

MEDLINE INDUSTRIES, INC.

By:
Its: General Counsel

# MEDLINE INDUSTRIES, INC.
# EMPLOYMENT AGREEMENT

THIS AGREEMENT is entered into at Mundelein, Illinois, this 19th day of February, 2001, by and between Medline Industries, Inc., an Illinois corporation having its principal office at One Medline Place, Mundelein, Illinois 60060 (herein referred to as "Medline"), and Susan Schardt of 108 Casselman Street, Folsom, CA 95630, (hereinafter referred to as "Salesperson").

WHEREAS, Medline is engaged in the distribution and sale of health care products, some of which are manufactured by or for it; and

WHEREAS, Medline desires to employ Salesperson to assist in the distribution and sale of such products by Medline, and Salesperson desires to become so employed, all on terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of the foregoing recitals, of the provisions hereinafter set forth, and of other good and valuable considerations, the receipt and sufficiency of which are mutually acknowledged, the parties hereto agree as follows:

1. **EMPLOYMENT**

Medline hereby employs Salesperson, and Salesperson hereby agrees to become and be employed by Medline, as one of its salesmen, upon and subject to the terms and conditions hereinafter set forth.

2. **TRAINING**

(a) If Salesperson has not acted as a salesperson for Medline prior to the date hereof, Medline shall provide and Salesperson shall undergo Medline's regular training program for new salesmen.

(b) Medline shall bear and pay the costs of Salesperson's travel to and from the Chicago Metropolitan area, and the costs of his travel, lodging, and maintenance while in sales training, subject to reasonable limitations on said costs as prescribed by Medline.

3. **DUTIES of Salesperson**

(a) Salesperson shall solicit orders from customers and potential customers in the territory hereinafter referred to for the purchase of all products and services now or hereafter offered by Medline or any of its subsidiaries or affiliates. All such orders shall be promptly transmitted by Salesperson to Medline's principal office, for acceptance or rejection, in whole or in part, as Medline in its sole discretion deems advisable.

(b) No order shall be binding upon Medline unless and until it shall have been accepted by Medline at its principal office as aforesaid, and only to the extent of such acceptance and subject to any conditions or limitations imposed thereon. No representations, warranties, promises or agreements made by Salesperson to or with any customer shall be valid unless set forth in a written order which is accepted by Medline at its principal office. Salesperson shall under no circumstances collect any money from customers, unless directed to do so in writing by a duly authorized officer of Medline.

(c) Salesperson shall visit the customers in his territory on a regular and frequent basis, and shall fully service and satisfy their needs in relation to the products and services now or hereafter offered by Medline or any of its subsidiaries or affiliates. Salesperson will also use his best efforts to establish new customers in his territory for such products and services.

(d) Salesperson will from time to time attend such sales meetings, seminars, training programs, and other meetings as Medline may reasonably prescribe, provided that if attendance there at requires Salesperson to travel outside his territory, then Medline shall pay the cost of Salesperson's travel to and from, and his lodging and maintenance while in such place, subject to reasonable limitations imposed by Medline on the amounts thereof. Medline bears no liability or responsibility for any injury to any party, including salesperson, that results from any actions taken during any unsupervised period of time during meetings.

(e) Salesperson will devote his full time and effort to the performance of his duties under this Agreement. During the term of this Agreement, Salesperson shall not engage in or devote time to any other business, occupation, venture, or employment whatever, except that Salesperson may attend to personal investments not requiring any direct or indirect involvement in the management or operation of any business or venture, and may engage to a reasonable degree in charitable, civic and similar pursuits not entered into for profit or monetary compensation. The provisions of the immediately preceding sentence shall be deemed an express and separable negative covenant capable of enforcement as such by equitable relief.

(f) During the term of any notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, Medline may, solely at its option, assign alternative duties to Salesperson, including duties of an administrative nature. In the event Salesperson is required to travel outside of his territory to perform such alternative duties, Medline shall pay the cost of Salesperson's travel to and from his destination, and his lodging while at such destination, subject to reasonable limitations imposed by Medline on the amounts thereof.

4. TERRITORY

(a) Salesperson shall perform the duties specified in Paragraph 3 with respect to customers located within the territory described in Paragraph 20 attached hereto and made a part hereof, except for any customers within said territory who may be excluded by the terms of said Paragraph 20.

(b) If at any time, in the reasonable judgment of Medline, Salesperson shall fail to adequately cover, service, or sell in any portion of said territory, or shall fail to adequately service or sell to any existing or potential customer or customers within said territory, Medline may in its discretion withdraw said portion of the territory or said customer or customers from the territory described in Paragraph 20. Medline may at any time thereafter in its discretion reassign said portion of the territory or such customer or customers to Salesperson.

(c) Medline shall have the right at any time to withdraw from Salesperson's territory dealers, distributors, or any other customers other than health care institutions. Further, Medline shall have the right from time to time to establish and maintain sales personnel specializing in the sale of certain categories of products and/or services, and Salesperson shall cooperate with and assist such personnel in the sale of such Paragraph 6(a).. Further, any contrary provision of this Agreement notwithstanding, Medline shall have the right at any time to withdraw certain products or services now or hereafter offered by Medline or any of its subsidiaries or affiliates from among those for which Salesperson shall be entitled to solicit orders from the customers within his territory, in which event Medline may designate other sales personnel to solicit customers within Salesperson's territory for the products or services now or hereafter offered by Medline or any of its subsidiaries or affiliates withdrawn for Salesperson.

(d) If at the time of execution of this Agreement, Salesperson is a sales trainee and no territory is yet established in Paragraph 20, this Agreement shall nevertheless be effective in all other respects, but Medline shall propose to Salesperson in writing, not later than the date on which Salesperson ceases to be a sales trainee, a territory to be incorporated in Paragraph 20. If Salesperson accepts such territory in writing, it shall be deemed to be incorporated into Paragraph 20 and to be a part of this Agreement, whether or not physically so incorporated therein. If Salesperson fails to accept such territory in writing within ten days after receipt of written notice thereof, then either Medline or Salesperson may within a reasonable time thereafter terminate this Agreement.

(e) If at any time or times hereafter, Medline amends or modifies the territory described in Paragraph 20 or any customer exclusion recited therein, or add a new territory thereto or substitute another territory therefore, or if Medline shall withdraw any portion of the territory or any customer or customers therein as provided in paragraphs (b) and (c) above, all references in this Agreement to the territory described in Paragraph 20 shall thereafter be deemed to refer to such territory as so amended, modified, reduced, or enlarged, or to such new territory added to or substituted therefor.

(f) Salesperson will be given a sales quota and their performance in relation to that sales quota will be one of a number of standards of performance on which they will be judged.

5. EXPENSES

(a) Medline will reimburse normal and customary business expenses that have been approved by the salesperson's manager.

(b) Salesperson shall maintain in force and pay the premiums for policies of public liability and property damage insurance relating to use of Salesperson's automobile and to all other activities of Salesperson on behalf of Medline, in solvent and reputable companies and with limits of liability satisfactory to Medline, which policies shall name Medline an additional insured and shall not be canceled without at least ten days prior written notice by the insurer to Medline.

(c) Salesperson shall have no authority to incur any expenses on behalf of Medline or to bind Medline with respect of payment thereof, and shall not make any representation to the contrary to any third party.

(d) If Medline at any time pays any item or items of expense which Salesperson is obligated hereunder to bear and pay, such payment shall not bind Medline to make any other payments in the future with respect to the same or any similar item or items of expenses.

(e) If Medline requires any documentation in order to reimburse expenses, Salesperson will provide such documentation within a prescribed time frame.

6. COMPENSATION

(a) Compensation is outlined in the attached offer letter.

(b) Medline will furnish to Salesperson from time to time price lists covering the products offered by Medline showing, among other things, the selling price for each product and the base cost associated therewith as determined by Medline. Medline may at any time add products to or delete products from such price lists or change any of the information contained thereon, including, without limitation, changes in the base cost for any product.

(c) For the purpose of commission computations, the "selling price" of any item shall be defined to mean the gross sales price actually charged the customer, exclusive of sales taxes, use taxes, gross receipts taxes, or other taxes charged directly to the customer, and minus any and all discounts, rebates, and trade-ins and other allowances, other than discounts for prompt payment or similar cash discounts.

(d) In the event an order for an item is submitted by Salesperson and accepted by Medline and sold at a selling price different than the selling price set forth for such item in Medline's price list, then the rate of commission payable to Salesperson thereon shall be such as Medline determines to be equitable, considering the actual selling price, and base cost associated therewith, in relation to the selling price set forth in Medline's price list.

(e) Except as otherwise provided in Subparagraph (i) below, commissions on sales for which the collections are received by Medline prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.

(f) In the reasonable judgment of Medline, if any discount, rebate, product return allowance or other allowance of any kind not previously taken into account in computing commissions payable to Salesperson is granted to a customer, then Medline shall have the right to charge to Salesperson (and in its discretion to offset against any future compensation which may become payable to him) the amount of commission attributable to any such uncollectible amount, discount, rebate, product return allowance or other allowance of any kind.

(g) Medline may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, Medline may periodically vary the amount of salary and/or the rate of commission pursuant to such election.

(h) Medline may, solely at its option, in lieu of permitting Salesperson to continue his duties as provided in Paragraph 3(a)-(f) of this Agreement, elect to compensate Salesperson to perform alternative duties as provided in Paragraph 3(f) during the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement at a monthly rate equal to the average monthly earnings of Salesperson during the three months immediately preceding the month in which either party gives the other notice of termination.

(i) During the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, commissions shall be deemed earned by Salesperson only if collected prior to the effective date of termination of this Agreement under any circumstances. All commissions so earned during the term of such notice period shall be paid to Salesperson, provided Medline receives actual payment from the customer prior to termination date. Commissions due to Salesperson in accordance with this subparagraph after the termination of Salesperson's employment shall be paid to Salesperson as promptly as possible.

(j) Medline may, but shall be under no obligation to, from time to time elect to award Salesperson certain types and amounts of discretionary bonus compensation, in addition to the compensation provided for in subparagraphs (a)-(i) above.

(k) In the event Salesperson becomes indebted to Medline for any reason in connection with his employment hereunder; Medline reserves the right to offset any such indebtedness against any compensation due to Salesperson from Medline. Such indebtedness shall include but not be limited to certain customer charges and credits for which Salesperson is liable in accordance with Medline's policy with respect thereto and any other losses sustained by Medline for which Salesperson is responsible. Medline reserves the right to hold Salesperson's final compensation payment until all of Salesperson's customer accounts have been audited to Medline's full satisfaction and any sums due to Medline as a result thereof, or otherwise, have been accurately calculated for offset purposes.

7. MEDLINE'S PROPERTY AND CONFIDENTIAL INFORMATION

(a) All tangible items furnished to Salesperson from time to time in connection with the performance of his duties, including but not limited to samples, catalogues, price lists, cases, computer software and it's licenses and selling or promotional aids, shall at all times remain the sole property of Medline. All such items are entrusted by Medline to Salesperson for the limited purpose of enabling him to perform his duties hereunder, and Salesperson shall not, either during or after the term of this Agreement, use or permit any of the same to be used for any other purpose. Upon the demand of Medline at any time, or upon the termination of this Agreement, under any circumstances, Salesperson shall forthwith deliver all such items to Medline at its office in Mundelein, Illinois. If Salesperson fails or refuses to do so, Medline shall have the right to recover from Salesperson as liquidated damages the sum of One Thousand Dollars ($1,000.00), which the parties agree represents a reasonable estimate of the cost to Medline of replacing such items, provided however that neither the exercise nor the non-exercise of such remedy shall impair any other remedy which Medline may have, at law or in equity, for the enforcement of either the provisions or this paragraph (a), or any other provision of this Agreement.

(b) All information imparted to Salesperson by Medline or otherwise obtained by Salesperson at any time relating to Medline's methods of doing business, its costs, sources of supply, manufacturing, marketing, and selling techniques, computer programs, inventory methods, billing procedures, any trade secrets, product ideas, pricing and commission data, customer names and lists, customer requirements and purchases, and other customer data, including, without limitation, information from third parties that Medline is obligated to keep secret, (The "Confidential Information") is revealed and entrusted to Salesperson in confidence solely in connection with and for the purposes of his employment on behalf of Medline hereunder. Confidential Information does not include any information that is or may become know to Salesperson or to the public from sources outside Medline and through means other than a breach of this Agreement. Salesperson agrees not to disclose, and to take all precautions necessary to prevent the disclosure of Confidential Information to any unauthorized individual or organization inside or outside Medline of all Confidential Information known to Salesperson, both during and after the term of this Agreement. Without limiting the generality of the foregoing, upon the termination of this Agreement under any circumstances, Salesperson shall forthwith deliver to Medline all lists, records, materials, notes and other tangible items that contain, relate to or are connected in any way with Confidential Information, as described above, and shall not retain any copies thereof.

8. PROHIBITIONS REGARDING MEDLINE CUSTOMERS AND EMPLOYEES

(a) It is understood and agreed by Salesperson that all business relationships and goodwill now existing with respect to customers of Medline to be served by Salesperson hereunder, whether or not created by Salesperson, and all such relationships and goodwill which may hereafter be created or enhanced by Salesperson in the course of his employment hereunder, constitute proprietary rights and interests of Medline, and shall inure to the sole benefit of, and are and shall at all times remain the sole property of Medline. Accordingly, Salesperson agrees that during the term of this Agreement he will not, directly or indirectly, solicit orders from, sell, or render services to any customer solicited, sold or serviced by Salesperson in the course of his employment by Medline, either as a sales representative or as a sales trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by Medline or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, form, or corporation to do any of the aforesaid acts.

(b) Medline and Salesperson desire to enter into an employment relationship involving full and open communications and mutual trust. Salesperson desires to encourage Medline to make available to him all pertinent confidential information concerning Medline's existing customers (much of which has been acquired at great effort and expense over a number of years) including pricing, costs, and other confidential information, which Medline has taken appropriate steps to maintain as confidential. Accordingly, for a period of one year beginning on the termination of this Agreement under any circumstances, Salesperson agrees that he will not, directly or indirectly, solicit orders from, sell or render services in the restricted geographical area defined hereafter to any customer solicited, sold, or serviced by Salesperson in the course of his employment by Medline, either as a sales representative or as a sale trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by Medline or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, firm or corporation to do any of the aforesaid acts.

(c) During the term of this Agreement and for the further period of one year beginning on the termination of this Agreement under any circumstances, Salesperson will not, directly or indirectly, solicit or induce any officer, sales representative, or other employee of Medline or any subsidiary or affiliated corporation to leave his employment, nor will Salesperson in any such capacity hire or cause to be hired any person who within one year prior thereto shall have been employed as an officer, sales representative, or other employee of Medline or any subsidiary or affiliated corporation, for any employment in a line of business similar to that conducted by Medline, nor shall Salesperson directly or indirectly aid or assist any other person, firm, or corporation to do any of the aforesaid acts.

(d) The provisions of this Paragraph 8 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of Paragraph 7.

(e) In addition to any and all other remedies which may be provided by law, Medline shall have the right to restrain the breach of any provision of Paragraphs 7 or 8 by injunction in any court of competent jurisdiction.

(f) As used in this Paragraph 8, the phrase "any product or service sold by Medline or any subsidiary or affiliated corporation" shall mean those products or services which Salesperson is from time to time authorized to sell by Medline or any subsidiary affiliated corporation either during the term of this Agreement or within one year prior to the termination of this Agreement, whichever period is shorter.

(g) Notwithstanding the foregoing, in the event that any part of the covenants set forth in Paragraph 8 shall be held to be invalid or unenforceable, the remaining parts hereof shall nevertheless continue to be valid and enforceable as though the invalid and unenforceable part had not been included herein. In the event that any provision of this Paragraph 8 relating to the time period and/or area of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time periods or areas such court deems reasonable and enforceable, such time period and/or area shall be deemed to become and thereafter be the maximum time period and/or which such court deems reasonable and enforceable.

9. TERMINATION

(a) The term of this Agreement shall continue indefinitely, provided however, that either Salesperson or Medline may terminate this Agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice.

(b) In addition to the right of termination provided in subparagraph (a) above, Medline may terminate this Agreement forthwith and without prior notice to Salesperson in the event Salesperson commits any act of embezzlement, theft, fraud, or dishonestly, related to his employment, or in the event Salesperson commits any material breach of this Agreement.

(c) This Agreement shall terminate automatically upon the death of a Salesperson.

(d) Upon the termination of this Agreement under any circumstances, Salesperson (or his estate) shall be entitled only to those unpaid commissions, if any, earned by him (as defined in paragraph 6(f) on or prior to the date of such termination, subject to any proper reductions thereof as provided in Paragraph 6, and to all unpaid salary, if any, accrued for any period prior to such termination. Medline may offset against any such amounts due Salesperson any and all amounts due or which may become due from Salesperson to Medline. Salesperson (or his estate) shall in no event be entitled to commissions with respect to any amount collected from a customer after the date of termination, irrespective of whether any purchase order, contract, or other commitment relating thereto shall have been entered into prior to the date of termination. If an election, during all or any portion of the notice period provided in subparagraph (a) above, is made by Medline under Paragraph 6(j) of this Agreement, Salesperson shall only be entitled during the duration and upon the termination of this Agreement to the compensation provided for in Paragraph 6(j), less any applicable offset amount provided for herein, any provision of this subparagraph notwithstanding.

(e) In the event Salesperson terminates or abandons his employment hereunder under any circumstances without providing to Medline the full fourteen (14) days written notice of termination provided for in Paragraph 10(a) above, he shall pay to Medline, because damages would be difficult to estimate and ascertain, upon demand, the sum of Five Thousand Dollars ($5,000.00) as liquidated damages, and not as a penalty for such breach, which the parties agree fairly approximates the expense, damages or injury which Medline is likely to sustain prior to and/or in obtaining other service equivalent to the service that was promised and not performed by Salesperson, with a reasonable allowance for additional compensation to cover any consequential injuries to Medline arising as a proximate and foreseeable consequence of Salesperson's breach, which amount, or any portion thereof, may be deducted form any compensation otherwise due and payable to Salesperson.

10. REMEDIES CUMULATIVE

Any and all remedies granted to Medline herein or provided at law or in equity shall be cumulative with all other remedies, and neither the exercise nor non-exercise by Medline of any such remedy shall preclude or impair the exercise by it of any other such remedy.

11. WAIVER

The waiver by Medline of any right hereunder or of any breach of this Agreement shall not operate as or be construed as an amendment of this Agreement or as a waiver of any other than existing or future right or breach.

12. ENTIRE AGREEMENT

This written memorandum constitutes the entire agreement of the parties with respect to the subject matter hereof, and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein.

13. AMENDMENT

This Agreement may be amended only by writing signed by Salesperson and by a corporate officer of Medline.

14. SURVIVAL OF PROVISIONS

Any provision of this Agreement which by its terms or by reasonable implication is to be or may be performed or effective after the termination of this Agreement shall be deemed to survive such termination.

15. SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised form this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

All notices hereunder shall be either delivered personally to Salesperson or to the President or Vice Presidents of Sales, or shall be sent by United States mail, postage prepaid, addressed to Medline at its principal place of business and addressed to Salesperson at the address last shown on Medline's books as the residence of Salesperson. Any such notice shall be deemed given and effective when received.

16. BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties' hereto and there respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by Salesperson.

17. GOVERNING LAW

This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose.

18. COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute buy one and the same agreement.

19. TERRITORY

Territory to consist of accounts listed on Salesperson's Customer Listing Report. This report will always be made available to the Salesperson by Medline at any time.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

ATTEST:

[signature]
Vice President

MEDLINE INDUSTRIES, INC.

By: [signature]
Corporate Officer

Susan A. Scharder
Salesperson

**MEDCAL SALES, LLC**
**EMPLOYMENT AGREEMENT**

2741

THIS AGREEMENT is entered into at Mundelein, Illinois, this 10 of February, 2006 by and between MedCal Sales, LLC, an Illinois limited liability (herein referred to as "MedCal"), and **SUSAN A. SCHARDT**; (SSN: [redacted]) of [redacted], **FOLSOM, CA 95630**, (hereinafter referred to as "Salesperson").

WHEREAS, MedCal is engaged in the distribution and sale of health care products, some of which are manufactured by or for it; and

WHEREAS, MedCal desires to employ Salesperson to assist in the distribution and sale of such products by MedCal, and Salesperson desires to become so employed, all on terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of the foregoing recitals, of the provisions hereinafter set forth, and of other good and valuable considerations, the receipt and sufficiency of which are mutually acknowledged, the parties hereto agree as follows:

1. **EMPLOYMENT**

MedCal hereby employs Salesperson, and Salesperson hereby agrees to become and be employed by MedCal, as one of its salesmen, upon and subject to the terms and conditions hereinafter set forth.

2. **TRAINING**

(a) If Salesperson has not acted as a salesperson for MedCal prior to the date hereof, MedCal shall provide and Salesperson shall undergo MedCal's regular training program for new salesmen. Until full completion of such program, Salesperson shall be considered employed by MedCal as a sales trainee.

(b) MedCal shall bear and pay the costs of Salesperson's travel to and from the Chicago Metropolitan area, and the costs of his travel, lodging, and maintenance while a sales trainee, subject to reasonable limitations on said costs as prescribed by MedCal.

(c) At the conclusion of Phase III training (approximately six months post commencement of employment), Salesperson shall cease to be a sales trainee and a "provisional employee," and shall commence the performance of his duties as one of MedCal's salesperson, in accordance with the provisions of this Agreement and the policies and procedures applicable to all sales representatives, including but not limited to the progressive disciplinary policies.

3. **DUTIES of Salesperson**

(a) Salesperson shall solicit orders from customers and potential customers in the territory hereinafter referred to for the purchase of all products and services now or hereafter offered by MedCal or any of its subsidiaries or affiliates. All such orders shall be promptly transmitted by Salesperson to MedCal's principal office, for acceptance or rejection, in whole or in part, as MedCal in its sole discretion deems advisable.

(b) No order shall be binding upon MedCal unless and until it shall have been accepted by MedCal at its principal office as aforesaid, and only to the extent of such acceptance and subject to any conditions or limitations imposed thereon. No representations, warranties, promises or agreements made by Salesperson to or with any customer shall be valid unless set forth in a written order which is accepted by MedCal at its principal office. Salesperson shall under no circumstances collect any money from customers, unless directed to do so in writing by a duly authorized officer of MedCal.

(c) Salesperson shall visit the customers in his territory on a regular and frequent basis, and shall fully service and satisfy their needs in relation to the products and services now or hereafter offered by MedCal or any of its subsidiaries or affiliates. Salesperson will also use his best efforts to establish new customers in his territory for such products and services.

(d) Salesperson will from time to time attend such sales meetings, seminars, training programs, and other meetings as MedCal may reasonably prescribe, provided that if attendance there at requires Salesperson to travel outside his territory, then MedCal shall pay the cost of Salesperson's travel to and from, and his lodging and maintenance while in such place, subject to reasonable limitations imposed by MedCal on the amounts thereof. MedCal bears no liability or responsibility for any injury to any party, including salesperson, that results from any actions taken during any unsupervised period of time during meetings.

(e) Salesperson will devote his full time and effort to the performance of his duties under this Agreement. During the term of this Agreement, Salesperson shall not engage in or devote time to any other business, occupation, venture, or employment whatever, except that Salesperson may attend to personal investments not requiring any direct or indirect involvement in the management or operation of any business or venture, and may engage to a reasonable degree in charitable, civic and similar pursuits not entered into for profit or monetary compensation. The provisions of the immediately preceding sentence shall be deemed an express and separable negative covenant capable of enforcement as such by equitable relief.

(f) During the term of any notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, MedCal may, solely at its option, assign alternative duties to Salesperson, including duties of an administrative nature. In the event Salesperson is required to travel outside of his territory to perform such alternative duties, MedCal shall pay the cost of Salesperson's travel to and from his destination, and his lodging while at such destination, subject to reasonable limitations imposed by MedCal on the amounts thereof.

4. **TERRITORY**

(a) Salesperson shall perform the duties specified in Paragraph 3 with respect to customers located within the territory described in Paragraph 20 attached hereto and made a part hereof, except for any customers within said territory who may be excluded by the terms of said Paragraph 20.

(b) If at any time, in MedCal's sole judgment, Salesperson shall fail to adequately cover, service, or sell in any portion of said territory, or shall fail to adequately service or sell to any existing or potential customer or customers within said territory, MedCal may in its discretion withdraw said portion of the territory or said customer or customers from the territory described in Paragraph 20. MedCal may at any time thereafter in its discretion reassign said portion of the territory or such customer or customers to Salesperson.

(c) MedCal shall have the right at any time to withdraw from Salesperson's territory dealers, distributors, or any other customers other than health care institutions. Further, MedCal shall have the right from time to time to establish and maintain sales personnel specializing in the sale of certain categories of products and/or services, and Salesperson shall cooperate with and assist such personnel in the sale of such Paragraph 6(a). Further, any contrary provision of this Agreement notwithstanding, MedCal shall have the right at any time to withdraw certain products or services now or hereafter offered by MedCal or any of its subsidiaries or affiliates from among those for which Salesperson shall be entitled to solicit orders from the customers within his territory, in which event MedCal may designate other sales personnel to solicit customers within Salesperson's territory for the products or services now or hereafter offered by MedCal or any of its subsidiaries or affiliates withdrawn for Salesperson.

(d) If at the time of execution of this Agreement, Salesperson is a sales trainee and no territory is yet established in Paragraph 20, this Agreement shall nevertheless be effective in all other respects, but MedCal shall propose to Salesperson in writing, not later than the date on which Salesperson ceases to be a sales trainee, a territory to be incorporated in Paragraph 20. If Salesperson accepts such territory, it shall be deemed to be incorporated into Paragraph 20 and to be a part of this Agreement, whether or not physically so incorporated therein. If Salesperson fails to accept such territory in writing within ten days after receipt of written notice thereof, then either MedCal or Salesperson may within a reasonable time thereafter terminate this Agreement.

(e) If at any time or times hereafter, MedCal amends or modifies the territory described in Paragraph 20 or any customer exclusion recited therein, or add a new territory thereto or substitute another territory therefore, or if MedCal shall withdraw any portion of the territory or any customer or customers therein as provided in paragraphs (b) and (c) above, all references in this Agreement to the territory described in Paragraph 20 shall thereafter be deemed to refer to such territory as so amended, modified, reduced, or enlarged, or to such new territory added to or substituted therefore.

(f) Salesperson will be given a sales quota and their performance in relation to that sales quota will be one of a number of standards of performance on which they will be judged.

5. **EXPENSES**

(a) Except as expressly provided in Paragraph 3(d), Salesperson shall bear and pay all expenses incurred in the performance of his duties as a salesperson, including but not limited to automobile and other travel expense; lodging, meals and maintenance away from home; entertainment; telephone calls to and from customers and to MedCal; expenses of Salesperson's home office; and necessary catalogues, samples, cases, and supplies other than those which MedCal may from time to time elect to furnish without cost to Salesperson.

(b) Salesperson shall maintain in force and pay the premiums for policies of public liability and property damage insurance relating to use of Salesperson's automobile and to all other activities of Salesperson on behalf of MedCal, in solvent and reputable companies and with limits of liability satisfactory to MedCal, which policies shall name MedCal an additional insured and shall not be canceled without at least ten days prior written notice by the insurer to MedCal.

(c) Salesperson shall have no authority to incur any expenses on behalf of MedCal or to bind MedCal with respect of payment thereof, and shall not make any representation to the contrary to any third party.

(d) If MedCal at any time pays any item or items of expense which Salesperson is obligated hereunder to bear and pay, such payment shall not bind MedCal to make any other payments in the future with respect to the same or any similar item or items of expenses.

(e) If MedCal requires any documentation in order to reimburse expenses, Salesperson will provide such documentation within a prescribed time frame.

6. **COMPENSATION**

(a) Subject to the provisions hereafter set forth, MedCal shall pay to Salesperson commissions with respect to the collections of all sales made by MedCal to customers in the territory described in Paragraph 20, except for customers excluded by the terms of said Paragraph 20, provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties as a salesperson hereunder and is on or before the effective date of termination of this Agreement under any circumstances. Salesperson shall be entitled to a commission on any sale as set forth herein, irrespective of whether Salesperson shall have been responsible for such sale, provided however, that if a sale is made in whole or in part through the efforts of one or more other employees of MedCal specializing in the sale of certain categories of products and/or services as provided in Paragraph 4(c), then the commission applicable to such sale shall be apportioned between Salesperson and such other employee or employees on a basis deemed equitable by MedCal.

(b) MedCal will furnish to Salesperson from time to time price lists covering the products offered by MedCal showing, among other things, the selling price for each product and the base cost associated therewith as determined by MedCal. MedCal may at any time add products to or delete products from such price lists or change any of the information contained thereon, including, without limitation, changes in the base cost for any product.

(c) For the purpose of commission computations, the "selling price" of any item shall be defined to mean the net sales price actually charged the customer (which is the gross sales price exclusive of sales taxes, use taxes, gross receipts taxes, or other taxes charged directly to the customer, and minus any and all other adjustments including but not limited to discounts, rebates, and trade-ins and other allowances, other than discounts for prompt payment or similar cash discounts.

(d) In case of sale of any item with respect to which MedCal shall incur freight or other charges to transport the item to the customer, then unless such freight or other charges are reimbursed by the customer to MedCal separate from and in addition to the selling price, the commission which would otherwise be payable to Salesperson thereon shall be reduced by an amount equal to one-third of such freight or other transportation charges.

(e) In the event an order for an item is submitted by Salesperson and accepted by MedCal and sold at a selling price different than the selling price set forth for such item in MedCal's price list, then the rate of commission payable to Salesperson thereon shall be such as MedCal determines to be equitable, considering the actual selling price, and base cost associated therewith, in relation to the selling price set forth in MedCal's price list.

(f) Except as otherwise provided in Subparagraph (i) below, commissions on sales for which the collections are received by MedCal prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.

(g) In the reasonable judgment of MedCal, if any discount, rebate, product return allowance or other allowance of any kind not previously taken into account in computing commissions payable to Salesperson is granted to a customer, then MedCal shall have the right to charge to Salesperson (and in its discretion to offset against any future compensation which may become payable to him) the amount of commission attributable to any such uncollectible amount, discount, rebate, product return allowance or other allowance of any kind.

(h) MedCal may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, MedCal may periodically vary the amount of salary and/or the rate of commission pursuant to such election. MedCal may change or vary commission rates at its discretion and further may elect to compensate on a salary plus commission basis, a salary basis, or in any other manner MedCal deems appropriate.

(i) Subject to modification from time to time, and subject to subparagraphs (c)-(h) above, the commission compensation payable by MedCal to Salesperson shall be in accordance with the commission schedule set forth in Paragraph 21.

(j) MedCal may, solely at its option, in lieu of permitting Salesperson to continue his duties as provided in Paragraph 3(a)-(f) of this Agreement, elect to compensate Salesperson to perform alternative duties as provided in Paragraph 3(f) during the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement at a monthly rate equal to the average monthly earnings of Salesperson during the three months immediately preceding the month in which either party gives the other notice of termination.

(k) During the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, commissions shall be deemed earned by Salesperson only if collected prior to the effective date of termination of this Agreement under any circumstances. All commissions so earned during the term of such notice period shall be paid to Salesperson, provided MedCal receives actual payment from the customer prior to termination date. Commissions due to Salesperson in accordance with this subparagraph after the termination of Salesperson's employment shall be paid to Salesperson as promptly as possible.

(l) MedCal may, but shall be under no obligation to, from time to time elect to award Salesperson certain types and amounts of discretionary bonus compensation, in addition to the compensation provided for in subparagraphs (a)-(k) above. Salesperson's eligibility to receive these bonuses is based on their compensation status (full commission salesperson = 100% payout and salary salesperson = 50% payout). To be eligible for any bonus is contingent upon continued employment and when said bonus is paid out.

(m) The calculation of commissions includes reductions and modifiers, resulting from certain expenses incurred in servicing commissionable business. Commissions also are subject to adjustments, before or after paid, if the corresponding sale is adjusted, credited, or voided altogether. In the event Salesperson becomes indebted to MedCal for any reason in connection with his employment hereunder, MedCal reserves the right, and Salesperson agrees, that any such indebtedness may be offset by deductions against commissions and compensation due to Salesperson from MedCal. Such indebtedness shall include but not be limited to certain customer charges and credits for which Salesperson is liable in accordance with MedCal's policy with respect thereto and any other losses sustained by MedCal for which Salesperson is responsible. MedCal reserves the right to hold Salesperson's final compensation payment until all of Salesperson's customer accounts have been audited to MedCal's full satisfaction and any sums due to MedCal as a result thereof, or otherwise, have been accurately calculated for offset purposes.

7. **MEDCAL'S PROPERTY AND CONFIDENTIAL INFORMATION**

(a) All tangible items furnished to Salesperson from time to time in connection with the performance of his duties, including but not limited to samples, catalogues, price lists, cases, computers, computer software and it's licenses and selling or promotional aids, shall at all times remain the sole property of MedCal. All such items are entrusted by MedCal to Salesperson for the limited purpose of enabling him to perform his duties hereunder, and Salesperson shall not, either during or after the term of this Agreement, use or permit any of the same to be used for

any other purpose. Upon the demand of MedCal at any time, or upon the termination of this Agreement, under any circumstances, Salesperson shall forthwith deliver all such items to MedCal at its office in Mundelein, Illinois.

(b) All information imparted to Salesperson by MedCal or otherwise obtained by Salesperson at any time relating to MedCal's methods of doing business, its costs, sources of supply, manufacturing, marketing, and selling techniques, computer programs, inventory methods, billing procedures, any trade secrets, product ideas, pricing and commission data, customer names and lists, customer requirements and purchases, and other customer data, including, without limitation, information from third parties that MedCal is obligated to keep secret, (The "Confidential Information") is revealed and entrusted to Salesperson in confidence solely in connection with and for the purposes of his employment on behalf of MedCal hereunder. Confidential Information do not include any information that is or may become know to Salesperson or to the public from sources outside MedCal and through means other than a breach of this Agreement. Salesperson agrees not to disclose, and to take all precautions necessary to prevent the disclosure of Confidential Information to any unauthorized individual or organization inside or outside MedCal of all Confidential Information known to Salesperson, both during and after the term of this Agreement. Without limiting the generality of the foregoing, upon the termination of this Agreement under any circumstances, Salesperson shall forthwith deliver to MedCal all lists, records, materials, notes and other tangible items that contain, relate to or are connected in any way with Confidential Information, as described above, and shall not retain any copies thereof.

8. **PROHIBITIONS REGARDING MEDCAL CUSTOMERS AND EMPLOYEES**

(a) It is understood and agreed by Salesperson that all business relationships and goodwill now existing with respect to customers of MedCal to be served by Salesperson hereunder, whether or not created by Salesperson, and all such relationships and goodwill which may hereafter be created or enhanced by Salesperson in the course of his employment hereunder, constitute proprietary rights and interests of MedCal, and shall inure to the sole benefit of, and are and shall at all times remain the sole property of MedCal. Accordingly, Salesperson agrees that during the term of this Agreement he will not, directly or indirectly, solicit orders from, sell, or render services to any customer solicited, sold or serviced by Salesperson in the course of his employment by MedCal, either as a sales representative or as a sales trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by MedCal or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, form, or corporation to do any of the aforesaid acts.

(b) MedCal and Salesperson desire to enter into an employment relationship involving full and open communications and mutual trust. Salesperson desires to encourage MedCal to make available to him all pertinent confidential information concerning MedCal's existing customers (much of which has been acquired at great effort and expense over a number of years) including pricing, costs, and other confidential information, which MedCal has taken appropriate steps to maintain as confidential. Accordingly, for a period of one year beginning on the termination of this Agreement under any circumstances, Salesperson agrees that he will not, directly or indirectly, solicit orders from, sell or render services in the area defined hereafter to include Salesperson's Territory and any and all customers solicited, sold, or serviced by Salesperson in the course of his employment by MedCal, and to include the geographical area encompassing these customers, either as a sales representative or as a sale trainee, at any time during the term of this Agreement, with respect to any product or service competitive with any product or service sold by MedCal or any subsidiary or affiliated corporation, nor shall Salesperson directly or indirectly aid or assist any other person, firm or corporation to do any of the aforesaid acts.

(c) During the term of this Agreement and for the further period of one year beginning on the termination of this Agreement under any circumstances, Salesperson will not, directly or indirectly, solicit or induce any officer, sales representative, or other employee of MedCal or any subsidiary or affiliated corporation to leave his employment, nor will Salesperson in any such capacity hire or cause to be hired any person who within one year prior thereto shall have been employed as an officer, sales representative, or other employee of MedCal or any subsidiary or affiliated corporation, for any employment in a line of business similar to that conducted by MedCal, nor shall Salesperson directly or indirectly aid or assist any other person, firm, or corporation to do any of the aforesaid acts.

(d) The provisions of this Paragraph 8 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of Paragraph 7.

(e) In addition to any and all other remedies which may be provided by law, MedCal shall have the right to restrain the breach of any provision of Paragraphs 7 or 8 by injunction in any court of competent jurisdiction.

(f) As used in this Paragraph 8, the phrase "any product or service sold by MedCal or any subsidiary or affiliated corporation" shall mean those products or services which Salesperson is from time to time authorized to sell by MedCal or any subsidiary affiliated corporation either during the term of this Agreement or within one year prior to the termination of this Agreement, whichever period is shorter.

(g) Notwithstanding the foregoing, in the event that any part of the covenants set forth in Paragraph 8 shall be held to be invalid or unenforceable, the remaining parts hereof shall nevertheless continue to be valid and enforceable as though the invalid and unenforceable part had not been included herein. In the event that any provision of this Paragraph 8 relating to the time period and/or area of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time periods or areas such court deems reasonable and enforceable, such time period and/or area shall be deemed to become and thereafter be the maximum time period and/or which such court deems reasonable and enforceable.

9. **REIMBURSEMENT OF MEDCAL'S EXPENSES**

(a) Salesperson acknowledges that MedCal has paid or incurred an employment agency fee to SUSAN A. SCHARDT in the amount of with respect to employment of Salesperson.

Salesperson agrees that if his employment hereunder is terminated voluntarily by salesperson or for cause by MedCal within 18 months after commencement of his duties as a salesperson, he will reimburse MedCal for all or part of such amounts in accordance with the following schedule:

| **If Voluntary Termination Occurs** | **Percent to be Reimbursed** |
|---|---|
| Within 3 months | 100% |
| More than 3 months but within 6 months | 75% |
| More than 6 months but within 18 months | 50% |
| If Termination Occurs for Cause | 100% |

If Salesperson voluntarily terminates his employment prior to the employment agency fee due date, Salesperson will not be held responsible for such fees.

Paragraph 9a (if applicable) does not supersede previous Employment Agreement.

(b) If Salesperson fails to satisfactorily complete the training course pursuant to Paragraph 2 hereof, or if Salesperson after satisfactorily completing such course fails for any reason (including but not limited to rejection of a territory proposed by MedCal pursuant to Paragraph 4(d) to enter in good faith upon the performance of his duties as a salesperson hereunder, he shall reimburse MedCal for 100% of all amounts, if any, paid or incurred by it for employment agency fees as aforesaid.

(c) Upon the request of MedCal at any time, Salesperson shall execute and deliver to MedCal a promissory note with confession of judgment clause, in form prescribed by MedCal, evidencing any or all of Salesperson's potential obligations under this Paragraph 9.

10. **TERMINATION**

(a) The term of this Agreement shall continue indefinitely, provided however, that either Salesperson or MedCal may terminate this Agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice.

(b) In addition to the right of termination provided in subparagraph (a) above, MedCal may terminate this Agreement forthwith and without prior notice to Salesperson in the event Salesperson commits any act of embezzlement, theft, fraud, or dishonestly, related to his employment, or in the event Salesperson commits any material breach of this Agreement.

(c) This Agreement shall terminate automatically upon the death of a Salesperson.

(d) Upon the termination of this Agreement under any circumstances, Salesperson (or his estate) shall be entitled only to those unpaid commissions, if any, earned by him (as defined in paragraph 6(f) on or prior to the date of such termination, subject to any proper reductions thereof as provided in Paragraph 6, and to all unpaid salary, if any, accrued for any period prior to such termination. MedCal may offset against any such amounts due Salesperson any and all amounts due or which may become due from Salesperson to MedCal. Salesperson (or his estate) shall in no event be entitled to commissions with respect to any amount collected from a customer after the date of termination, irrespective of whether any purchase order, contract, or other commitment relating thereto shall have been entered into prior to the date of termination. If an election, during all or any portion of the notice period provided in subparagraph (a) above, is made by MedCal under Paragraph 6(j) of this Agreement, Salesperson shall only be entitled during the duration and upon the termination of this Agreement to the compensation provided for in Paragraph 6(j), less any applicable offset amount provided for herein, any provision of this subparagraph notwithstanding.

(e) In the event Salesperson terminates or abandons his employment hereunder under any circumstances without providing to MedCal the full fourteen (14) days written notice of termination provided for in Paragraph 10(a) above, he shall pay to MedCal, because damages would be difficult to estimate and ascertain, upon demand, the sum of Five Thousand Dollars ($5,000.00) as liquidated damages, and not as a penalty for such breach, which the parties agree fairly approximates the expense, damages or injury which MedCal is likely to sustain prior to and/or in obtaining other service equivalent to the service that was promised and not performed by Salesperson, with a reasonable allowance for additional compensation to cover any consequential injuries to MedCal arising as a proximate and foreseeable consequence of Salesperson's breach, which amount, or any portion thereof, may be deducted form any compensation otherwise due and payable to Salesperson.

11. **REMEDIES CUMULATIVE**

Any and all remedies granted to MedCal herein or provided at law or in equity shall be cumulative with all other remedies, and neither the exercise nor non-exercise by MedCal of any such remedy shall preclude or impair the exercise by it of any other such remedy.

12. **WAIVER**

The waiver by MedCal of any right hereunder or of any breach of this Agreement shall not operate as or be construed as an amendment of this Agreement or as a waiver of any other than existing or future right or breach.

13. **ENTIRE AGREEMENT**

This written memorandum constitutes the entire agreement of the parties with respect to the subject matter hereof, and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein.

14. **AMENDMENT**

This Agreement may be amended only by a writing signed by Salesperson and by a corporate officer of MedCal.

15. **SURVIVAL OF PROVISIONS**

Any provision of this Agreement which by its terms or by reasonable implication is to be or may be performed or effective after the termination of this Agreement shall be deemed to survive such termination.

16. **SEPARABILITY AND MODIFICATION**

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised form this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

All notices hereunder shall be either delivered personally to Salesperson or to the President or Vice Presidents of Sales, or shall be sent by United States mail, postage prepaid, addressed to MedCal at its principal

place of business and addressed to Salesperson at the address last shown on MedCal's books as the residence of Salesperson. Any such notice shall be deemed given and effective when received.

17. **BINDING EFFECT**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and there respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by Salesperson.

18. **GOVERNING LAW**

This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose.

19. **COUNTERPARTS**

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute buy one and the same agreement.

20. **TERRITORY**

Territory as used in this Agreement (including Section 8(b)) consists at least of the accounts listed on Salesperson's current Customer Listing Report. This report will always be made available to the Salesperson by MedCal at any time.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

ATTEST: MEDCAL SALES, LLC.

[signature]
Medline Representative Signature / Date

S. A. Schardt 3/1/04
Salesperson Signature / Date

[signature]
JOSEPH BECKER
VP HUMAN RESOURCES

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| David Cohan and Susan Schardt, on behalf of themselves and other similarly situated persons, known and unknown, | |
| Plaintiffs, | Case No. 14 C 1835 |
| v. | Judge John Robert Blakey |
| Medline Industries, Inc., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

This is a purported class action concerning the Defendants' allegedly improper payment of commissions to their salespeople. Plaintiffs allege: (1) violation of the Illinois Wage Payment and Collection Act (the "IWPCA" or the "Act") on behalf of a putative national class; and (2) violation of several state wage payment statutes on behalf of a putative multi-state class. As to the state wage payment statutes, the individual Plaintiffs allege claims under the New York Labor Law (Cohan) and California Labor Code (Schardt). The Court stayed proceedings on class certification to allow for resolution of the parties' cross-motions for summary judgment on the individual Plaintiffs' claims. [88], [92]. As explained below, Defendants' motion for summary judgment is granted and Plaintiffs' motion is denied.

Prior to discussing the factual background underlying this dispute, and in order to focus the background section on the relevant issues, the Court briefly sets

out the parties' general positions. There are two principal disputes here: (1) Did the Plaintiffs perform sufficient work in Illinois for the Act to govern their claims; and (2) Did the commission payments at issue violate the Act, the California Labor Code, or the New York Labor Law. As to the first issue, Plaintiffs spent a number of days in Illinois each year for training and promotional meetings. They claim this was sufficient to trigger the Act. Defendants disagree.

As to the second issue, the wage payment statutes invoked by Plaintiffs do not create independent rights, but instead create a cause of action against employers who fail to pay the wages and commissions they agreed to pay in their employment agreements. The parties disagree as to what commissions the Plaintiffs were entitled to under the agreements here. According to Plaintiffs, they were entitled to commissions based solely on their accounts with sales growth; and accounts where sales declined should not have been factored into their commissions. Plaintiffs' argue that commissions should have been calculated as follows:

| **Plaintiffs' Position** | | | | |
|---|---|---|---|---|
| | January 2010 Sales | January 2011 Sales | Year-over-year Sales Change | Commission Earned (5%) |
| Account 1 | $500K | $1,500K | + $1,000K | $50K |
| Account 2 | $500K | $100K | – $400K | $0K |
| Account 3 | $500K | $0K | – $500K | $0K |
| Total | | | | $50K |

On the other hand, Defendants argue that the parties agreed to a commission calculation based on the subtraction of sales declines from sales growth. Once that calculation was completed, the commission amount was then computed based upon

the amount of growth that exceeded the amount of decline. Defendants argue that commissions were appropriately calculated as follows:

| Defendants' Position | | | | |
|---|---|---|---|---|
| | January 2010 Sales | January 2011 Sales | Year-over-year Sales Change | Commission Earned (5%) |
| Account 1 | $500K | $1,500K | + $1,000K | $50K |
| Account 2 | $500K | $100K | – $400K | – $20K |
| Account 3 | $500K | $0K | – $500K | – $25K |
| Total | | | | $5K |

Plaintiffs claim that Defendants' deductions from their "sales growth" based upon the decline in sales for certain accounts was an illegal deduction from commissions that they had already earned under their employment agreements. Defendants disagree. Crucial to this Court's analysis, then, is a determination of how the parties agreed to calculate commissions and when those commissions were "earned."

## I. Background[1]

Defendant Medline Industries, Inc. is a privately held manufacturer and distributor of healthcare supplies in the United States. PSOF ¶ 5. Both Medline Industries and its subsidiary, Defendant MedCal Sales LLC, have their corporate headquarters in Mundelein, Illinois. PSOF ¶¶ 5, 6. With respect to the issues addressed in this Opinion, there are no material distinctions between Medline Industries and MedCal Sales. The Court will thus use the term "Medline" to refer to either or both entities. Medline employed outside salespeople from around the country as sales representatives in their Advanced Wound Care ("AWC") division.

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendants' statement of undisputed facts [90], with Plaintiffs' responses where applicable [100]. "PSOF" refers to Plaintiffs' statement of facts [94], with Defendants' responses where applicable [97].

PSOF ¶ 5. Salespersons in the AWC division were assigned a geographic territory, and were responsible for selling AWC products to new or existing clients within that territory. DSOF ¶ 6. The named Plaintiffs, David Cohan ("Cohan") and Susan Schardt ("Schardt"), were each employed as sales representatives in the Defendants' AWC division. PSOF ¶¶ 1, 3. Cohan, a New York resident, sold Defendants' products throughout New York. *Id.* at ¶ 2. Schardt, a California resident, sold Defendants' products in a territory that included California, Nevada and Hawaii. *Id.* at ¶ 4.

**a. Cohan's Employment with Medline**

Cohan began working with Medline as a salesperson in the company's General Line division. DSOF ¶ 23. He served in that capacity from 1992 to 2006. *Id.* Cohan's employment as an AWC salesperson in the General Line division was governed by a March 25, 1999 "Employment Agreement." *Id.* at ¶ 24. The Court will refer to that contract as the "Cohan 1999 Agreement." As a General Line salesperson, Cohan was paid a variable commission on every sale, based on profitability, with a bonus based on growth. *Id.* at ¶ 25. The Cohan 1999 Agreement contained the following provisions:

| **Cohan 1999 Agreement** | |
|---|---|
| Commission | (a) Subject to the provisions hereafter set forth, Medline shall pay to Salesperson commission with respect to the collections of all sales made by Medline to customers in the [Salesperson's] territory . . . provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties.<br><br>(f) Commissions on sales for which the collections are received by Medline prior to the last day of any fiscal month shall be |

| | |
|---|---|
| | paid to Salesperson on or about the 15th day of the next calendar month.<br><br>(h) Medline may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, Medline may periodically vary the amount of salary and/or the rate of commission pursuant to such election.<br><br>(k) [During the term of the pre-termination notice period set out in the Agreement], commissions shall be deemed earned by Salesperson only if collected prior to the effective date of the termination of this Agreement under any circumstances." |
| Termination | (a) The term of this Agreement shall continue indefinitely, provided, however, that either Salesperson or Medline may terminate this agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice. |
| Governing Law | This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose. |

Cohan transitioned to work as a salesperson in the AWC division in December 2007. DSOF ¶ 22. He stayed in that position until his resignation in July 2013. *Id.* Cohan's transition to the AWC division was governed by a November 26, 2007 "Agreement Regarding Continued Employment." *Id.* at ¶ 26. The Court will refer to that agreement as the "Cohan 2007 Agreement." The Cohan 2007 Agreement amended the Cohan 1999 Agreement, such that the 1999 Agreement remained in effect as amended. The 2007 Agreement included the following provisions:

| Cohan 2007 Agreement | |
|---|---|
| Amendment | Employee will transition from the General Line sales force to the Advanced Wound Care ("AWC") sales force. Employee will continue to be employed "at will" and will continue to be subject to the employment agreement executed on March 25, 1999. This Agreement does not terminate or supersede the employment agreement, and does not amend the employment agreement or any other agreement between Employee and Medline, except as expressly provided herein. |
| Commission | The following terms will apply to Employee's continued employment with Medline, and in the event of any inconsistency between these terms and the terms in the employment agreement or any other agreement between Employee and Medline, these terms shall control:<br><br>• Commission plan based on sales growth year over year for assigned territory. |

**b. Schardt's Employment with Medline**

Schardt worked as a salesperson in Medline's AWC division for approximately thirteen years, from February 2001 through her termination in July 2014. DSOF ¶ 54. Schardt's employment with Medline was governed by a February 19, 2001 "Employment Agreement" with Medline Industries, Inc. (the "Schardt 2001 Agreement"), and a February 10, 2006 "Employment Agreement" with MedCal Sales, LLC (the "Schardt 2006 Agreement"). *Id.* at ¶ 57. Plaintiffs agree that Schardt's two agreements are substantially identical, and the Court will refer to the agreements collectively as the "Schardt Agreements." [93] at 4. With only minor differences between them, the Schardt Agreements included the following provisions:

| **Schardt Agreements** | |
|---|---|
| Commission | (a) Subject to the provisions hereafter set forth, MedCal shall pay to Salesperson commissions with respect to the collections of all sales made by MedCal to customers in the [Salesperson's] territory . . . provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties.<br><br>(f) Commissions on sales for which the collections are received by MedCal prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.<br><br>(h) MedCal may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, MedCal may periodically vary the amount of salary and/or the rate of commission pursuant to such election. MedCal may change or vary commission rates at its discretion and further may elect to compensate on a salary plus commission basis, a salary basis, or in any other manner MedCal deems appropriate.<br><br>(k) [During the term of the pre-termination notice period set out in the Agreement], commissions shall be deemed earned by Salesperson only if collected prior to the effective date of the termination of this Agreement under any circumstances." |
| Termination | (a) The term of this Agreement shall continue indefinitely, provided, however, that either Salesperson or MedCal may terminate this agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice. |
| Governing Law | This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose. |

Apart from those agreements, in May 2001 Schardt received a memo from then Vice President of AWC Sales, Chris Simpson ("Simpson"), explaining that a compensation plan was going to be "unveiled" during the upcoming Division Sales Meetings, and that the new plan included payment of commissions tied to growth. DSOF ¶ 61.

**c. Annual Compensation Plans**

In addition to the above employment agreements, Medline's AWC division released Compensation Plans for its salespeople on a yearly basis that described how commissions would be calculated during that year. PSOF ¶ 20. Those compensation plans were reviewed for the upcoming year at promo meetings typically held in December or January. *Id.* The Compensation Plans from 2004-2007 specify that commissions "are based on monthly sales growth and profitability." [95] at Exs. 1-2. They specify that "growth commissions are calculated" as follows: (2004 monthly sales - 2003 monthly sales) x WC Base Profit % x 20% = Commission. *Id.* They each provide some version of the following example:

| | |
|---|---|
| January 2004 Sales: | $165,000 |
| January 2003 Sales: | - $125,000 |
| Monthly Growth: | = $40,000 |
| X WC Base Profit (%28.5): | = $11,400 |
| X 20%: | = $2,280 (monthly commission) |

The Compensation Plans for 2010-2014 state that the salespeople were entitled to a "commission paid on sales growth." [95] at Exs. 1-2. They did not include any sample calculations. *Id.*

**d. Medline's Calculation of the Commissions at Issue**

To calculate year over year sales growth during the relevant time period from 2004-2014, Medline started with the AWC salesperson's invoiced sales for the current month and subtracted their sales from the same month in the prior year. DSOF ¶ 8. Depending on whether the AWC salesperson sold more in the current month, than in the same month the previous year, that calculation could result in a positive sales growth number or a negative sales growth number. *Id.* To calculate commissions based on sales growth, Medline then multiplied the AWC salesperson's sales growth (or decline) by a commission percentage. *Id.* at ¶¶ 9-10. In some years during the relevant time period, commissions were calculated by multiplying the sales growth figure for each product category or "bucket" by a specific commission percentage assigned to that category. DSOF ¶ 9. In other years, the commission percentage was applied to the salesperson's overall territory sales growth. *Id.* at ¶ 10. Whether the sales growth component was calculated by product category or by overall territory, the commission calculation always included all of the AWC salesperson's business – *i.e.*, combining accounts with positive sales growth and accounts with negative sales growth. *Id.* at ¶ 11.

**e. Medline's Monthly Reporting**

In addition to the annual Compensation Plans described above, AWC salespersons received at least two other reports detailing their sales growth and their commissions based on sales growth each month: (1) the "Wound Care Commission Summary and Growth Report" and (2) the "Commission Summary by

Item Detail Report" (also referred to as the "Commission Growth Summary Detail Report" or the "Detailed Commission Report"). DSOF ¶ 15. AWC salespersons had access to these reports each month through Medline's intranet.

The Wound Care Commission Summary and Growth Report showed each AWC salesperson's sales for the month as compared to the same month in the prior year, broken down by product groupings for the Salesperson's entire territory. *Id.* at ¶ 16. The Wound Care Commission Summary and Growth Report also included a chart titled "Commission Calculation," which reported commissions for each product category (whether positive or negative) based upon that month's sales growth. *Id.* at ¶ 17. The line labeled "Total Commission" then showed the sum of all commissions for the month, adding the positives and negatives together across all product categories. *Id.* at ¶ 18.

The Commission Summary by Item Detail Report showed sales growth in additional detail, including sales growth by account and by product. *Id.* at ¶¶ 19-20. The Commission Summary by Item Detail Report also includes a column labeled "Commissions $" which listed a positive or negative dollar figure for each account and product. *Id.* at ¶ 19. In this manner, the Report correlated the salesperson's negative sales growth to the salesperson's commissions by account and item, providing the Salesperson with a monthly look at how the negative growth generated negative reported commissions. *Id.* at ¶ 20. Cohan and Schardt both received these types of monthly reports on an ongoing basis from Medline since at least 2009. DSOF ¶ 21. The above mentioned reports, along with other

information, showed both Cohan and Schardt exactly how their commissions were calculated.

### f. Cohan's Understanding of the Commission Plans

At the time of his transition to the AWC sales force, Cohan discussed the fact that his commissions would be based on sales growth year over year for his assigned territory with his new boss, Arthur Singer ("Singer"), and with Medline's then Vice President of AWC Sales, Doug Brown ("Brown"). *Id.* at ¶ 29. As early as January 2008, Cohan received and reviewed the Commission Summary and Growth Report, showing that Medline was including negative sales growth in its calculation of Cohan's commissions. *Id.* at ¶¶ 30-31. In particular, Cohan testified that the negative figures in the February 2008 Commission Summary and Growth Report stood out and caught his attention. *Id.* at ¶ 32. Since at least 2009, when he received and analyzed the Commission Summary by Item Detail Report, it became clear to Cohan that sales decline was included as a negative number in the commission calculations. *Id.* at ¶ 33. According to Cohan, the detail report "exposed everything out there" and made it "very, very apparent," using plusses and minuses, "where all the negatives were coming from." *Id.* at ¶ 33.

In 2009, Cohan complained to Singer about the calculation of commissions, asking: "Where are these negatives coming from? Why?" DSOF ¶ 34. Singer responded, "That's the pay plan. If you don't like it, leave." DSOF at ¶ 34. Also, at an AWC promo meeting in August of 2010 or 2011, Cohan again questioned Medline's inclusion of lost business in the calculation of commissions for the AWC

division. *Id.* at ¶ 36. Christine Dorshorst ("Dorshorst"), who became Vice President of AWC Sales in 2011, responded: "This is my biggest pet peeve. You know, you get paid – your number is your number. You get paid over [sic] year over year." *Id.* at ¶ 36. According to Cohan, the consistent response from Medline management was "this is the pay plan" and "this is how we do it or go find another job." *Id.* at ¶ 37. At a promo meeting in August 2012, manager Michael Carroll ("Carroll") explicitly told Cohan "the negatives are never going away." *Id.* at ¶ 38.

Cohan testified that no one at Medline ever told him he would earn commissions without factoring in the decline in sales, and that there is no written documentation from Medline stating that negative sales growth would be zeroed out, such that he would earn commissions without considering negative growth. *Id.* at ¶ 39. According to Cohan, he and Medline had a "long-standing difference of opinion" and a "fundamental" disagreement about how his commissions should be calculated. *Id.* at ¶ 40. Despite this, Cohan understood that Medline factored negative growth into the calculation of his commissions, and he continued to work for Medline as an AWC salesperson until July 2013. *Id.* at ¶ 41. Schardt had a similar understanding of the commissions provided by Medline.

**g. Schardt's Understanding of the Commission Plans**

Schardt understood from the memo she received in May 2001 that her commissions would be based upon growth under the then new AWC compensation plan. DSOF ¶ 62. When she asked what "growth" meant, Schardt was told that to earn commissions based on growth, the sales in her territory for the present year

had to be greater than sales in the prior year. *Id.* at ¶ 63. Schardt claims that she first discovered that "negative commissions" were being "removed from her compensation" as part of Medline's commission calculation when she examined the BP Detail Report and the Commission Growth Summary Detail Report a few years after starting her employment with Medline. *Id.* at ¶ 64. According to Schardt, the Wound Care Commission Summary and Growth Report also reported negative growth – "everywhere you see a negative number." *Id.* at ¶ 65.

In June 2003, Schardt's manager, Jeff Rubel ("Rubel"), gave her a five-page memo addressing her frustration with her performance and sales numbers. *Id.* at ¶ 66. The June 2003 memo included a specific example of "Negative Monthly growth" resulting in "Negative Commission," noting: "This is what is having a significant impact on your monthly commissions." *Id.* at ¶ 67. After discussing the June 2003 memo with Rubel, Schardt understood the mechanism through which Medline included negative growth in the calculation of her commissions. *Id.* at ¶ 68. According to Schardt, the June 2003 memo specifically illustrated the very type of "deduction" she now alleges is illegal. *Id.* ¶ 67.

When Schardt approached Rubel and Dorshorst to ask "Why would they be taking money out of our checks?" their consistent response was, "We're not taking them away. The negative number, you add it all up, you subtract the negative, that's your commission. That's not coming out of your check." *Id.* at ¶ 69. On another occasion, when a group of AWC salespersons approached Dorshorst to discuss the impact of the negative numbers, Dorshorst responded "it is what it is" –

which Schardt took to mean "the pay plan is what the pay plan is and it's not going to change." *Id.* at ¶ 70. Schardt admits that no Medline manager ever told her that the negatives did not count or that they would be zeroed out. *Id.* at ¶ 71. Schardt also admits that there is no Medline document that she is aware of that reflects or explains the concept of zeroing out the negative growth so she would be paid only on "positive commissions" as she claims she should have been. *Id.* at ¶ 71. Despite the fact that Schardt and Medline did not "see eye-to-eye" on how commissions should be calculated, Schardt understood as early as 2003 that Medline included accounts with negative sales growth in the calculation of her commissions, and she continued to work for Medline as an AWC salesperson for eleven more years. *Id.* at ¶ 72.

**h. Cohan's Work in Illinois**

Cohan's territory as an AWC salesperson consisted of accounts located in New York, including the Bronx, Westchester, Queens, Manhattan, and Long Island. DSOF ¶ 42. Cohan serviced those accounts by conducting in-service training, communicating via phone and text messages, visiting on-site, and supplying information to the customers' internal decision-makers. *Id.* at ¶ 43. Cohan was also expected to generate new customers within his territory, which generally required in-person contact. *Id.* at ¶ 44. Cohan had one account that remained his responsibility after the customer relocated from New York to Illinois, but Cohan did not travel to Illinois to service that account. *Id.* at ¶ 45.

As an AWC salesperson, Cohan attended one national sales meeting per year and two AWC promo meetings per year. *Id.* at ¶ 46. The national sales meetings

lasted three to four days, and were held in the Chicagoland area in alternating years, or sometimes for two years in a row. *Id.* at ¶ 47. The AWC promo meetings lasted two to three days, and were more often than not held in Illinois, although they were sometimes held in other states. *Id.* at ¶ 48. Cohan's travel to Illinois for the national sales meetings and AWC promo meetings prevented him from spending in-person time with the customers in his territory, although he could "put out fires" and handle customer issues that did not need him on-site. *Id.* at ¶ 50. On the whole, Cohan contends that his travel to Illinois prevented him from earning commissions that he would have earned by working out of New York. *Id.* at ¶ 51. Other than attending these meetings, Cohan did not travel to Illinois for any Medline business during the time he worked as an AWC salesperson. *Id.* ¶ 53.

**i. Schardt's Work in Illinois**

Schardt's territory as an AWC salesperson consisted of accounts located in northern California, parts of Nevada, and Hawaii. *Id.* at ¶ 73. Schardt did not service any customers located in Illinois. DSOF at ¶ 73. As an AWC salesperson, Schardt traveled to her assigned territory to call on her customers in person, and also visited with customers from her territory at out-of-state conferences. *Id.* at ¶ 74. As an AWC salesperson, Schardt attended one national sales meeting per year and two to three AWC promo meetings per year. *Id.* at ¶ 75. The national sales meetings typically lasted for three and a-half days, and were located both in Illinois and in other states. *Id.* at ¶ 76. The AWC promo meetings were typically one or two days long, and were located in Illinois only about half of the time. *Id.* at ¶ 77.

During both types of meetings, Schardt had limited time to conduct her regular commissioned work of selling Medline products to her customers. *Id.* at ¶ 78. According to Schardt, travel to Illinois for meetings resulted in a sales loss (and therefore a deduction to her commissions) since she was not able to devote her time to making sales in her territory. *Id.* at ¶ 79. Other than attending the above meetings, Schardt did not travel to Illinois for any Medline business. *Id.* at ¶ 80.

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," and the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Liberty Lobby*, 477 U.S. at 255; *see also Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## III. Analysis

### a. Choice of Law

Before addressing the merits of the present dispute, the Court must first discuss the applicable law. The contracts at issue here all include the following choice of law provision: "This Agreement shall be governed in all respects by the

laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose." Under Illinois law, choice-of-law clauses are generally enforceable: "the law applicable to a contract is the law intended by the parties." *Smurfit Newsprint Corp. v. Southeast Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004). "When the parties express that intent (such as through a governing law provision), that express intent is generally recognized." *Id.* This includes non-breach of contract "claims that are dependent upon the contract." *Birnberg v. Milk St. Residential Associates Ltd. P'ship, No.* 02 C 0978, 2003 WL 151929, at *14 (N.D. Ill. Jan. 21, 2003); *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002).

Here, Plaintiffs argue that the Illinois choice of law provision means that the Act applies regardless of its territorial limitations. Defendants claim that the choice of law provision is irrelevant, as it cannot expand the Act's territorial limitations. According to Defendants, the designation of Illinois as the applicable law simply means that the Act *may* apply, but only if it would otherwise apply under its own terms.

At the motion to dismiss stage in this litigation, the previously-assigned judge, U.S. District Court Judge Manish Shah, declined to adopt Plaintiff's argument, stating: "I do not adopt Cohan's argument that the Illinois choice-of-law and choice-of-forum provision in the parties' contract entitled Cohan to the protections of the IWPCA." *Cohan v. Medline Indus., Inc.*, No. 14 CV 1835, 2014

WL 4244314, at *4 n.3 (N.D. Ill. Aug. 27, 2014). Judge Shah further explained "Cohan's argument is unpersuasive: standard choice-of-law and choice-of-forum contract provisions do not extend the reach of state statutes." *Id.* This decision remains the law of the case, and the Court declines to overturn it. *See Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009).

Consequently, this Court finds that the choice of law provision does not mean that the Act *automatically* applies to Plaintiffs here. Instead, the Court must determine whether the Act applies to the Plaintiffs based upon its own terms and limitations. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 386 (7th Cir. 2003) ("if they insist (as they must, because the contract chooses Illinois law) that Illinois law applies, then we must look to the law of Illinois to determine the scope of [Act's] application"); *Int'l Profit Associates, Inc. v. Linus Alarm Corp.*, 971 N.E.2d 1183, 1192 (Ill. App. Ct. 2012) ("choice-of-law and forum-selection provisions will not automatically mandate the application of the Consumer Fraud Act").

**b. Applicability of the IWPCA**

The Act states its scope explicitly: "This Act applies to all employers and employees in this State, including employees of units of local government and school districts," but exempting employees of the "State or Federal governments." 820 ILCS § 115/1. The Act does not have an "extraterritorial reach;" rather, its "evident purpose is to protect employees *in Illinois* from being stiffed by their employers."

*Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (emphasis in original).[2] This includes protecting "an employee who performs work in Illinois for an Illinois employer, even if he resides in another state." *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004). However, the Act does not apply simply because an employee has performed "*any* work in Illinois for an Illinois employer." *Vendetti v. Compass Envtl., Inc.*, No. 06 CV 3556, 2006 WL 3694852, at *2 (N.D. Ill. Dec. 14, 2006) (emphasis added).

In *Adams*, the Seventh Circuit found the Act applicable to a Michigan resident who had performed work in Illinois. *Adams v. Catrambone*, 359 F.3d at 865. The plaintiff in *Adams*, however, had performed "most" of his work in Illinois. *Id*. at 861. Also, in *Baxi*, the Court applied *Adams* to allow for the application of the Act to a non-resident employee who performed work in Illinois where "the overwhelming majority" of that work was done in Illinois. *Baxi*, 2011 WL 3898034, at *14. Apart from the foregoing, the courts have not specifically quantified the requisite amount of work that must be performed in Illinois for the Act to apply. They merely state that plaintiffs must have performed "sufficient" work in Illinois. *Spaulding v. Abbott Labs.*, No. 10 C 199, 2010 WL 4822894, at *6 (N.D. Ill. Nov. 22, 2010); *Baxi*, 2011 WL 3898034, at *14.[3]

---

[2] Plaintiffs request that this Court ignore *Glass* and hold that the Act applies extra-territorially. [93] at 22-23. Based on *Glass*, the Court cannot reach that conclusion. Plaintiffs' citation to Pennsylvania state law is not persuasive.

[3] The Court declines to adopt the test enunciated in *Chen v. Quark Biotech, Inc.*, No. 03 C 5729, 2004 WL 1368797, at *6 (N.D. Ill. June 17, 2004), that the alleged improper payments must have been related to work done in Illinois for the Act to apply. As explained by Judge Dow in *Baxi*, it is unclear whether that standard is appropriate under *Glass* and *Adams*. *Baxi*, 2011 WL 3898034, at *15.

Based upon the record, the Court finds that Plaintiffs here have not performed enough work in Illinois for the Act to apply. *Adams* and *Baxi* applied the Act to employees who had performed a significant amount of work in Illinois. Plaintiffs have not cited to any case law allowing the application of the Act to work in Illinois that was as limited as the Plaintiffs' minimal showing here. The Plaintiffs were only actually present in Illinois for, at most, a few days every year. And, while here, they were engaged primarily in training, not the actual sales work for which Plaintiffs were employed. This limited contact with the state is insufficient for the Court to find that Plaintiffs were "employees in [Illinois]" as required under the Act. To hold otherwise would give the statute an extraterritorial reach, in contravention of *Glass*. It would allow a cause of action under the Act for any employee who travelled to Illinois for brief periods of training, improperly expanding the *Glass* court's determination that the "evident purpose [of the Act] is to protect employees *in Illinois* from being stiffed by their employers." *Glass*, 133 F.3d at 1000 (emphasis in original).

**c. Violation of the IWPCA**

Even if the Court were to find that the Act applied to Plaintiffs, it would nonetheless find that Defendants did not violate the Act. The principal purpose of the Act is to ensure that employers honor the wage and payment terms of their employment agreements. 820 ILCS 115/3. The employer must provide "any compensation owed an employee . . . pursuant to an employment contract or agreement between the two parties, whether the amount is determined on a time,

task, piece, or any other basis of calculation." 820 ILCS 115/2. The Act further requires "that the employer honor his contract;" it does not, however, confer rights to compensation that are absent from the employee's contract or employment agreement. *See Galietta v. Comdisco Holding Co., Inc.*, No. 02 C 7030, 2003 WL 685645, at *3 (N.D. Ill. Feb. 27, 2003) (quoting *National Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir. 1986)). "It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed." *Brown v. Lululemon Athletica, Inc.*, No. 10 C 05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 27, 2003) (collecting cases).

To prevail under the Act, a plaintiff must show that he had a valid contract or employment agreement entitling him to the claimed payments. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012); *Stark v. PPM America, Inc.*, 354 F.3d 666, 672 (7th Cir. 2004). An "agreement" under the Act is "broader than a contract," and "requires only a manifestation of mutual assent on the part of two or more persons." *Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 250 (Ill. App. Ct. 2004); *Hess*, 668 F.3d at 452. The agreement need not be a "formally negotiated contract," nor must it contain the "formalities and accompanying legal protections of a contract." *Landers–Scelfo v. Corporate Office Sys., Inc.*, 356 Ill. App. 3d 1060, 1067–68 (Ill. App. Ct. 2005). An "employer and an employee, by acting in a manner consistent with an employment agreement, can set the material terms of the

agreement, including the amount of compensation." *Landers–Scelfo*, 356 Ill.App.3d at 1068.

Here, Plaintiffs have not proved an agreement entitling them to the commissions they seek (*i.e.*, commissions derived from a calculation that does not include negative sales growth). Of all the agreement language cited by the Plaintiffs, there is no indication that the calculation of commissions based on growth would exclude the effect that a decline in sales had upon that growth. Nor is there any indication that the commissions were "earned" before the calculation of commissions (by subtracting negative growth) was complete. To the contrary, the record is full of evidence showing that there was no agreement by Medline to pay commissions in the manner sought by Plaintiffs. All of the monthly reports Plaintiffs received and every communication Plaintiffs had with Medline management consistently confirmed that Medline was including negative sales growth in the calculation of Plaintiffs' commissions. DSOF ¶¶ 29-38; 62-70. Plaintiffs admit that no manager ever told them they would be paid commissions without taking into account negative sales growth in their territory, and there are no documents suggesting any agreement formal or informal to this effect. DSOF ¶¶ 39, 71. Also, when Plaintiffs proposed changing the terms of the commission plan to their preferred approach, Medline responded with a simple and clear "No." DSOF ¶¶ 34, 36-38; 69-70. Finally, a number of the annual compensation plans explained that "growth commissions" would be calculated as follows: (2004 monthly sales – 2003 monthly sales) x WC Base Profit x 20% = commission. If the 2003 monthly

sales were greater than the 2004 monthly sales, this would plainly result in a negative commission. Without mutual assent to the commission calculation sought by Plaintiffs, their claims under the Act fail. *Schneider v. Ecolab, Inc.,* No. 14 C 01044, 2015 WL 1402615, at *5 (N.D. Ill. Mar. 25, 2015) ("What Schneider overlooks is that he needs to establish 'a manifestation of mutual assent' from both parties about the purported terms of his employment agreement").

Moreover, Plaintiffs concede that they understood Medline's approach to calculating commissions (*i.e.*, including negative sales growth in the commissions calculation), and continued working as part of the AWC sales force for years thereafter. DSOF ¶¶ 40-41; 72. Under Illinois law, this type of evidence confirms an implied acceptance of Medline's payment terms. *Gallardo v. Scott Byron & Co.*, No. 12-CV-7202, 2014 WL 126085, at *15 (N.D. Ill. Jan. 14, 2014) ("The undisputed facts, however, show that no such agreement existed. Indeed, if any agreement existed, it was an agreement that SBC would not pay Gonzalez for pre- and post-shift work"); *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 698 (1st Dist. 2003) ("When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change"); *Schoppert v. CCTC International, Inc.*, 972 F. Supp. 444, 447 (N.D. Ill. 1997) ("continuing to work over two and one half years while receiving commissions under the new structure must be seen in legal terms as an acceptance . . . grudging and protest-filled as that acceptance may have been"). Given the foregoing, the Court finds that the commission payments at issue here did not violate the Act.

Plaintiffs attempt to avoid this finding by arguing that the protections afforded employees under the Act may not be waived, whether in writing or otherwise. *See O'Brien v. Enotech Construction Serv., Inc.*, 183 F. Supp. 2d 1047 (N.D. Ill. 2002) (releases under Wage Act are void as a matter of law); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2001 WL 1403007 (N.D. Ill. Nov. 9, 2001) (same). This is a correct statement of law, but does not affect the Court's conclusion here because the use of a commission calculation based in part on declines in sales does not constitute a waiver of the rights provided under the Act. As noted above, the Act only protects the payments provided for in the parties' agreement. Plaintiffs have provided no evidence that they were entitled to a commission calculation that ignored negative sales growth. Instead, the evidence shows that they assented to the opposite approach. Thus, the commissions at issue here comply with the parties' agreements as required under the Act, and thus fail to constitute any waiver of rights under the Act.

**d. The California and New York Claims**

The Court reaches the same conclusion with regard to Plaintiffs' claims under California and New York law. The Court finds that Plaintiffs' commissions were not "earned" until the commission calculation (sales growth – sales declines) was completed. Thus, any alleged deduction was not improper under the law, but was in accordance with the parties' agreements.

The New York Labor Law generally protects earned employee wages and commissions from an employer's unlawful deductions. N.Y. Lab. Law §§ 190(1),

193(1). Whether and when "a commission is earned is dependent upon the terms of the agreement providing for such commission." *Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520, 521 (N.Y. App. Ct. 2005). Deductions made *after* the commission is earned are illegal under Section 193. *Id.* ("defendant's compensation policy, which provided for the deduction from the plaintiffs' *earned* commissions in order to compensate for the company's losses, was a violation of Labor Law § 193") (emphasis added). On the other hand, Section 193 does not bar employers from structuring payment plans that include "downward adjustments" in the calculation of commissions, because employers and employees are free to fashion their own agreements regarding when commissions become "earned" wages. *See Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 617-18 (N.Y. 2008). As long as the employee is aware of these adjustments, understands them, and acquiesces to them by accepting the end result, this type of "deduction" is not unlawful. *Id.* Moreover, the employee's agreement to the commission plan need not be in writing. *Pachter*, 10 N.Y.3d at 618 ("The lack of a specific written contract is not determinative"). Thus, in *Pachter*, a course of dealings including written monthly statements issued by the employer and accepted by the employee provided "ample support for the conclusion that there was an implied contract under which the final computation of the commissions earned by Pachter depended on first making adjustments [for various costs and expenses]." *Id.*

Similarly, California law protects employees' earned wages (including commissions) from unlawful deductions by their employers. *See* Cal Lab. Code §§

221.[4] Again, however, the "right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1330 (1st Dist. 2006). Where an employee agrees to a "deduction" that is part of the calculation of earned commissions, the deduction is lawful. *Id.* at 1332 ("The commission plans between Appellants and Verio provided that, although commissions would be paid at booking (or, in 2002, installation), they were not in fact earned at that time [and were subject to later chargebacks]. This is what Appellants agreed. This is what Appellants understood. . . . We conclude that Verio's commission plans are enforceable"). The employee's agreement need not be in writing, but can be found to exist in implied contract where the employee received copies of the pay plan, training on the pay plan, and regular commission statements setting forth the alleged deductions, and thereafter continued his or her employment under the terms of the plan. *See Deleon v. Verizon Wireless*, LLC, 207 Cal. App. 4th 800, 813-14 (2d Dist. 2012) (applying Koehl and other § 221 case law to an analogous claim under § 223); *Prudential Ins. Co. of Am. v. Fromberg*, 240 Cal. App. 2d 185, 189 (Cal. Ct. App. 1966) ("When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent").

Based upon the Court's prior analysis of the facts underlying Plaintiffs' IWPCA claims, the Court finds that Defendants did not violate the California or

---

[4] It is unclear whether there is a private right of action under Cal. Lab. Code § 221. *Compare Mouchati v. Bonnie Plants, Inc.*, No. EDCV 14-00037-VAP, 2014 WL 1661245, at *8 (C.D. Cal. Mar. 6, 2014), *with Villalpando v. Exel Direct Inc.*, No. 12-CV-04137 JCS, 2014 WL 1338297, at *18 (N.D. Cal. Mar. 28, 2014). Because the Court bases its decision here on the merits of Plaintiffs' claims, it reaches no conclusion on whether there is a private right of action under Cal. Lab. Code § 221.

New York laws. There is nothing in the Plaintiffs' employment agreements requiring that their commissions be calculated without reference to sales declines; and there is nothing in the record indicating that Defendants agreed to such a calculation. Instead, Plaintiffs' actions in this matter manifest a clear intent to agree to the commissions as paid by the Defendants. As such, Defendants did not violate the California or New York Labor Laws.

**IV. Conclusion**

In light of the foregoing, Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted. The clerk is directed to enter judgment on behalf of Defendants. Civil case terminated.

IT IS SO ORDERED

Dated: March 21, 2016

Entered:

John Robert Blakey
United States District Judge